1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

CHERYL BISHOP,

            Plaintiff,

        v.

WILLIAM P. BARR, ATTORNEY
GENERAL, DEPARTMENT OF JUSTICE,
ALCOHOL, TOBACCO, FIREARMS &
EXPLOSIVES AGENCY,

            Defendants.

No.

COMPLAINT

JURY TRIAL REQUESTED

Plaintiff Cheryl Bishop alleges as follows:

## I.    NATURE OF CASE

1.1    This is an action for damages, and declaratory and injunctive relief to remedy and prevent racial harassment, discrimination, and retaliation against ATF Supervisor Cheryl Bishop. She brings this action under Title VII of the Civil Rights Act of 1964.

## II.    ADMINISTRATIVE EXHAUSTION

2.1    Plaintiff filed her formal individual complaint, numbered ATF-2020-00774 by ATF, with the Defendant more than 180 days ago.  No hearing has been scheduled.  An appeal has not been filed and a final action has not been taken, so Plaintiff has the right to file this civil action in court.

COMPLAINT - 1

### III.   JURISDICTION AND VENUE

3.1     This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).

3.2     The Court has personal jurisdiction over Defendant within the Western District of Washington.

3.3     Venue is proper in the Western District of Washington because a substantial part of the events complained of occurred in this District, the Plaintiff resides in this District, and the Plaintiff is assigned by Defendant to perform her duties for the Defendant in its offices located in this District. *See* 28 U.S.C. § 1391.

### IV.   PARTIES

4.1     Plaintiff Cheryl Bishop is an individual residing in Seattle, WA. She is African-American.  Since July 2013, she was a Senior Special Agent Canine Handler (SACH) for the Bureau of ATF until being promoted to Supervisor in 2017.

4.2     Defendant William P. Barr is the Attorney General of the United States, who is the appropriate "head" of the Department of Justice and its constituent federal agency, Alcohol Tobacco Firearms & Explosives (ATF) that employs Plaintiff, and therefore is the proper Defendant in this action, under 42 U.S.C. § 2000e-16(c).  Defendant is an employer within the meaning of Title VII.

### V.   FACTS

5.1     On April 24, 2018, Plaintiff Cheryl Bishop filed an employment discrimination lawsuit in this Court alleging, among other things, that ATF Group Supervisor (GS) Brad Devlin had been  subjecting her to a hostile work environment based on her race and in retaliation for her protected activity in reporting his racial harassment. *Bishop v. Sessions*, No. C18-00599- SZ (W.D. Wash.), Dkt. 1, ¶¶ 5.10-5.11. She alleged that she had repeatedly reported GS Devlin's misconduct to her employer, ATF, and that her superiors were aware of his racism, but that ATF failed to take effective action to remedy and prevent GS Devlin's misconduct. *Id*. ¶¶ 5.12-5.20. And further, Ms. Bishop alleged that ATF retaliated against her for her protected activity. *Id*. ¶¶

COMPLAINT - 2

1    5.21-5.42.  She alleged that Defendant's conduct violated Title VII of the Civil Rights Act of

2    1964 and she sought a declaration and injunction to prevent continuation of the misconduct.  *Id*.

3    ¶¶ 6.1-7.1.

4         5.2    In his deposition—which he widely circulated so is at issue in this lawsuit—GS

5    Devlin had testified that he had repeatedly disparaged and mocked Ms. Bishop, confirming his

6    own misconduct.  Exhibit A is a true copy of the transcript of GS Devlin's deposition (redacted

7    by him).  Among other things, he testified that he told ATF colleagues that Ms. Bishop is

8    "worthless," *id*. at 67:25-68:4, that she has a "poor" reputation and was "pushy or bossy" and

9    "difficult" to get along with, *id*. at 32:19-23, 40:9-41:3, that he told "two or three"

10   U.S. Attorneys that Ms. Bishop is a "train wreck" because "that was an accurate description,"

11   and it was "fine" for him to say about her, *id*. at 36:23-37:2, 39:22-25, 67:19-23, that he told

12   their fellow agents in Portland and Eugene, Oregon what he thinks of Ms. Bishop, *id*. at 68:14- 3,

13   that he found Ms. Bishop's request that he stop widely disparaging her "entertaining," *id*. at

14   73:19-74:24, that on one occasion he "wasn't going to put up with" her demeanor so "stood up"

15   and told her "Get the hell out of my office," *id*. at 42:15-43:4, that he thinks it is acceptable to

16   send to colleagues—including Ms. Bishop—jokes that ATF management testified were racially

17   offensive, *id*. at 44:15-46:6, and that Ms. Bishop was getting preferential treatment because she

18   had filed an EEO complaint, *id*. at 64:21-23.

19        5.3    Defendant reached a settlement of Ms. Bishop's legal claims, which the

20   *Seattle Times* newspaper reported in a news article published on November 18, 2019.  Exhibit B

21   is a true copy of the *Seattle Times* news article.

22        5.4    Three days later, on November 21, 2019, GS Devlin used his ATF email account

23   to send an email attacking Ms. Bishop and her protected activity to over 150 line level and

24   management employees of ATF—including the Seattle Field Office's two ASACs and SAC as

25   well as the Agency's Assistant Director of Field Operations, whose second line supervisor is the

26   Director of ATF.  Exhibit C is a true copy of GS Devlin's email.  Exhibit D is the list of the

27   known recipients to which GS Devlin sent his email.

COMPLAINT - 3

5.5     GS Devlin also sent his email to employees of other law enforcement agencies that work collaboratively with ATF, such as those of the City of Lakewood and the State of Oregon, as well as to contractors of the ATF. *Id.*

5.6     In his widely sent email, GS Devlin stated: "As you are all aware, The Seattle Times published another article on Nov. 18th announcing Cheryl Bishop's victory lawsuit against the government claiming harassment, discrimination, and retaliation (attached)." To his email, he attached the *Seattle Times* article reporting on Plaintiff's settlement with ATF, Exhibit B. He wrote, "Unfortunately, **I have not only been used as a means to her end** - but as an ATF employee, I was prohibited from discussing anything related to her 'pending litigation.'" *See* Exhibit C.  He attacked Ms. Bishop's ethics, accusing her falsely of having "gone to the media," when in fact the media came to her after finding the filings in court that were publicly available: "I am unaware of any ATF or DOJ policy which allows an employee to go to the media during ongoing litigation - criminal or civil. If I would have gone to the media, I would have been fired." *Id*. He asserted recklessly, and falsely, that "Cheryl and her attorney [] publish[ed] a photo of me and disclose[d] my identity as a current ATF employee.  I think this is **ethically wrong and unprofessional**." *Id*.

5.7     But "The media" obtained GS Devlin's name, employment, and photograph from public court filings, *see, e.g., Bishop v. Sessions*, No. C18-00599-TSZ, Dkts. 1, 41, and 43-4 at 30, not from Ms. Bishop or her lawyer.  And contrary to GS Devlin's false accusations, Ms. Bishop's lawyer shared her Complaint with lawyers for the U.S. Attorney's office *before* filing it in court for the express purpose of asking whether it contained text that the U.S. Attorney's Office believed should be filed under seal. The U.S. Attorney's office did not ask to seal or redact GS Devlin's name or affiliation with ATF, and indeed the ATF's publicly filed Answer mentioned him by name.  *See id*. Dkt. 14 (e.g., ¶¶ 5.11.5, 5.12, and 5.14). Instead, the U.S. Attorney's Office asked Ms. Bishop's lawyer to redact from the public filing other information, which the parties stipulated to in an order signed by the Court. *See id*. Dkts. 2, 3, and 13.  And, the U.S. Attorney's Office could have, but did not, designate the photograph of GS Devlin's

COMPLAINT - 4

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

11256.01 ni086703

1    tattoo as subject to the Protective Order entered by the Court. *See id.* Dkt. 21. In sum,

2    GS Devlin's public attacks on Ms. Bishop were scurrilous and retaliatory.

3        5.8    In his public email, GS Devlin repeated the defamatory and race-based criticisms

4    of Plaintiff and her work performance, experience, and work ethic that he had made about her

5    creating the hostile work environment that had led to her federal lawsuit for race discrimination,

6    harassment, and retaliation that ATF had just settled. He wrote: "I am guilty of **calling**

7    **Cheryl [Bishop] a trainwreck**. My use of that word was never based on Cheryl's race. It was

8    **based on her incompetence as an agent and lack of investigative experience.**" *Id*. (Emphasis

9    added). On top of this repeat of his public attack on Ms. Bishop, GS Devlin attached his own

10   testimony in her federal lawsuit, Exhibit A—in which he stated, restated, and justified his racist

11   criticisms of Plaintiff, as set forth in paragraph 5.2 above.

12       5.9    Several ATF employees reported to their superiors in management that they had

13   received GS Devlin's email and that it was offensive. The widespread receipt of GS Devlin's

14   email was reported up the ATF chain of command from the Seattle Field Office through each

15   layer of management of headquarters all the way to the Director of ATF. The email and

16   attachments were shared with the ATF Chief of Staff, the Deputy Assistant Director, and with

17   ATF's Internal Affairs Division. At the time GS Devlin sent his email, each member of

18   Plaintiff's chain of command all the way up to the Director of the Agency, had been aware of the

19   Plaintiff's prior EEO allegations and the previous lawsuit that she had filed. Some, such as

20   Plaintiff's ASAC and SAC, had personally investigated or overseen the investigation of some of

21   her EEO allegations. And since GS Devlin attached the *Seattle Times* article about the settlement

22   of that lawsuit and his own deposition testimony during the litigation, it was unmistakable to

23   each member of Plaintiff's chain of command, the ATF Chief of Staff, the Deputy Assistant

24   Director, and Internal Affairs that her protected activity prompted GS Devlin's email smearing

25   her throughout the Agency and beyond, and that the email was publicly disparaging of

26   Ms. Bishop.

27

COMPLAINT - 5

11256.01 ni086703

5.10    GS Devlin's email violated multiple ATF policies, including:

- ATF Order 86l0.1D, Integrity and Other Investigations, Section 11 (REPORTING ALLEGATIONS OF MISCONDUCT AND CRIMINAL ACTIVITY);

- ATF 0 2140.1A, Adverse Action and Discipline, Section 11 (AUTHORITY TO INVESTIGATE MISCONDUCT);

- ATF 0 2130.lB, Conduct and Accountability, Section 15 (DISCRIMINATION AND HARASSMENT) and Section 19 (REPORTING EMPLOYEE MISCONDUCT);

- ATF Order 2130.3A, Harassment in the Workplace, Section 7 (ROLES AND RESPONSIBLITIES) and Section 8 (REPORTING).

- Section 19: ATF 017 2140.1 A. Adverse Action and Discipline. Section 11: ATF.

5.11    ATF Policy includes the following requirements of supervisors and managers:

- Taking all necessary steps to prevent harassment in the work environment;

- Ensuring that, if harassment does occur, it is eliminated in a manner that is prompt, effective, and minimizes the effect on the victim to the extent possible upon being informed of a claim of harassing conduct within their area of responsibility and authority;

- Taking immediate and appropriate corrective action to hold those who engage in harassing conduct accountable, including promptly reporting allegations and information of harassing conduct to IAD [Internal Affairs Division]; and

- Upon being informed of a claim of harassing conduct within their area of responsibility and authority, providing interim relief to the alleged victims of harassment pending the outcome of the investigation to ensure that further harassment does not occur.

Excerpts of ATF Order 2130.3A Harassment in the Workplace, Section 7, Subparagraph b.

5.12    In response to GS Devlin's email, ATF did not investigate who had received the email and what any of the 150 plus recipients had done with it.  ATF did not interview GS

COMPLAINT - 6

Devlin to determine who he had sent his email to or whether he had taken other steps to harass or retaliate against Plaintiff. ATF did not discipline GS Devlin for his misconduct. Instead, Plaintiff's SAC claims that he "verbally counseled" Devlin and "considered the matter closed." Within ATF, counseling is not a form of discipline.  And despite claiming to have counseled GS Devlin, the SAC asserted he did not recognize that GS Devlin's email "may be construed as misconduct" implicating the ATF's Harassment in the Workplace policy, which required him to report it to the Internal Affairs Division (IAD), until someone else pointed it out to him. Exhibit E is a true copy of the SAC's email to this effect.

5.13    But the SAC undermined his purported referral to IAD, by writing to IAD: "After review, I am prepared to handle this matter ATF O 8610.1C, Paragraph 27, Management Referrals."  This meant that if IAD declined to take any action then the matter would be referred back to the SAC.  And predictably, that is exactly what happened. Exhibit F is a true copy of IAD's "Management Referral" back to the SAC—who then took no action whatsoever. ATF has since promoted the SAC.

5.14    Nor did ATF instruct any of its employees who had received Devlin's email to refrain from forwarding the email to others inside or outside the Agency.  ATF did not communicate to its employees that GS Devlin's retaliatory conduct was prohibited or reprehensible.  Neither did ATF communicate to its employees that GS Devlin's criticisms of Ms. Bishop were false or that she was in fact a skilled, respected, hardworking, and accomplished ATF Supervisor. Nor did ATF communicate to its employees that such retaliation will not be tolerated when employees come forward to bring EEO complaints.  Finally, ATF never asked Ms. Bishop what effect the wide-spread email had on her work environment or whether she needed any help or support as a result.  And ATF took no steps to remediate the mistreatment of Ms. Bishop or any steps reasonably calculated to prevent it from recurring.

5.15    In her prior federal anti-harassment lawsuit, Plaintiff had alleged that the Agency's "failure to discipline GS Devlin by issuing him only a "caution" —which in ATF is not discipline"—led to Devlin "foreseeably" continuing to abuse Ms. Bishop, disparaging her in

COMPLAINT - 7

1   the workplace. *Bishop v. Sessions*, No. C18-00599-TSZ, Dkt. 41, at p. 24; *see* Exhibit A (Devlin

2   Dep. 70:22-71:15). Indeed, according to Devlin's own testimony during that lawsuit, ATF never

3   told him to be careful about sending emails. *Id*. (Devlin Dep. 77:13-17). The Agency's failure

4   to take prompt and effective action again violated Ms. Bishop's rights under Title VII.

5   **History of GS Devlin's Racism that ATF Failed to Remedy, Leading to this Lawsuit**

6   5.16   In late April 2016, as Agent Bishop was planning to leave Seattle for a one-year

7   detail in Washington D.C., Agent Bishop was asked to serve as an acting Group Supervisor (GS)

8   in the Eugene, Oregon ATF office substituting for GS Brad Devlin—who was being considered

9   for a promotion to ATF Internal Affairs. To sabotage Agent Bishop, GS Devlin made damaging

10  and disparaging remarks about her to the ATF agents she would be supervising in Eugene and to

11  Assistant United States Attorneys in Oregon who she needed to work with to perform her job as

12  Group Supervisor there. GS Devlin told them that Agent Bishop lacked the professional

13  qualifications needed and that she would be a "train wreck."

14  5.17   This was only the most recent racial harassment and discrimination of

15  Agent Bishop, who is African-American, by GS Devlin, who is Caucasian. But it was the first

16  opportunity that GS Devlin had in quite some time to continue abusing her. During previous

17  years, GS Devlin had directly supervised Agent Bishop in Seattle. During that time, and from

18  2009 through 2012, GS Devlin had repeatedly committed racial harassment and discrimination

19  against Agent Bishop, which the Agency ignored and failed to stop. For example:

20  5.17.1 On January 20, 2009, Agent Bishop raised a concern to GS Devlin that she

21  had not been given her bullet-proof vest. Ignoring her stated concern, GS Devlin assigned her to

22  assist and cover a law enforcement operation thereby putting her life in danger without adequate

23  and required protective gear.

24  5.17.2  The next month, on February 19, 2009, GS Devlin sent an email explicitly

25  disparaging African-Americans regarding an African-American ASAC to a group of ATF agents,

26  including to SA Bishop and local law enforcement officers.

27

COMPLAINT - 8

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

5.17.3  On the same day, GS Devlin arranged for a presentation to a new Special Agent in Charge (SAC) about a Special Response Team (SRT) warrant and operation.  He invited all ATF and Task Force Officers in the group to attend, but he excluded Agent Bishop. All the other agents and task force officers in the group that he invited were white males (ATF SA Ken Cooper, ATF SA Craig Howe, and ATF-King County Task Force Officer Mike Garske). ATF Group Supervisor Douglas Krogh witnessed this.  GS Devlin did not inform Agent Bishop of the presentation.  Instead, after sitting on a project of developing an operational plan until the last minute, he then assigned SA Bishop to handle it during the presentation as an excuse so she would be unavailable to attend.

5.17.4 GS Devlin sent multiple emails to ATF agents under his supervision, including Agent Bishop, mocking African-Americans, including Barack Obama—while Obama was Commander in Chief and President of the United States.  Among the racially offensive emails GS Devlin sent was a mock Christmas card showing a black family celebrating the holiday behind bars.

5.17.5  GS Devlin wears a large Nazi-SS tattoo on his bicep that he claims to have obtained for working undercover in a white supremacist gang several years ago.  He declined to have it removed at ATF expense and showed it off publically to other ATF agents in front of Agent Bishop while eying her with a grin.

5.17.6  Without provocation, when Agent Bishop asked GS Devlin a question while in his office, GS Devlin walked up to Agent Bishop, yelled at her to her face, and raised his fist towards her as if to hit her while refusing to answer her work-related question.

5.18  Agent Bishop reported GS Devlin's racist conduct to her superiors, but they took no action. In 2009, she reported them to GS Devlin's supervisor, ASAC Robert Levingston, who claimed he spoke to GS Devlin about his physical threat to her and to ASAC Charlie Smith and SAC Kelvin Crenshaw about GS Devlin's display of his offensive white supremacist tattoo.  But the Agency did not investigate, report the incidents, or take any action.  During 2016, Agent Bishop spoke more than once with ATF Budget Analyst (BA) Linda Gathercole about

COMPLAINT - 9

Supervisor Devlin's discriminatory and harassing behavior.  Likewise, during and before 2016, Agent Bishop spoke on more than one occasion with Division Operations Officer (DOO) Casey Xiong about GS Devlin's discriminatory and harassing behavior.  And in several conversations with ASAC Celinez Nunez, Agent Bishop had described the history and pattern of GS Devlin committing incidents of racial harassment and discrimination.

5.19   Despite ATF's knowledge that Group Supervisor Brad Devlin has engaged in discriminatory behavior and racial harassment and brings racist attitudes to work, the Agency repeatedly looked the other way.

5.20   In April 2016, a colleague in the Portland, Oregon ATF office, GS Colleen Domenech, reported to Agent Bishop that GS Devlin was sabotaging Ms. Bishop to other agents and Assistant U.S. Attorneys.  In response, Agent Bishop emailed GS Devlin asking him to stop.  In response, he feigned ignorance, claiming to "have no idea what you are talking about" and that he has "not disparaged you to anyone."  But he admitted to her that he had expressed his opinion of her, when asked by others.

5.21   Deeply troubled that GS Devlin was undermining her reputation and authority within the agency and to the U.S. Attorney's Office where she would be stationed, Agent Bishop told her superior, ASAC Nunez, about GS Devlin's misconduct.  And, on April 21, 2016, Agent Bishop forwarded to ASAC Nunez her email exchanges with GS Devlin.  That same day, ASAC Nunez forwarded the emails to SAC Dawson and discussed the issue with him because, Nunez wrote, "I will need to address it."

5.22   On May 2, 2016, Agent Bishop again met with ASAC Nunez. ASAC Nunez told Agent Bishop that she had a "candid" conversation with Group Supervisor Devlin about his recent disparaging comments about Agent Bishop.  But ASAC Nunez made no mention of the ATF investigating or disciplining him for his misconduct or taking any action at all. ASAC Nunez asked Agent Bishop, "would it make you feel better if I wrote a letter for his file?" ASAC Nunez said, "You know, he will probably just wipe his ass with it."  ASAC Nunez said that if Agent Bishop "felt strongly about it" and "if it would make you feel better" to have

COMPLAINT - 10

1   ASAC Nunez put something in Devlin's file then Agent Bishop was welcome to send

2   ASAC Nunez something in writing and include any relevant documents.  ASAC Nunez told

3   Agent Bishop that it was "too bad previous managers did not handle the situation" with Devlin.

4   5.23   In response, the following day, in a memorandum dated May 3, 2016,

5   Agent Bishop reported to her ATF Seattle Field Division Management, ASAC Celinez Nunez

6   and SAC Douglas Dawson, that ATF Group Supervisor Brad Devlin had racially harassed and

7   discriminated against her.

8   5.24   The next day, May 4, 2016, Agent Bishop saw Seattle Field Office SAC Dawson

9   standing outside the door of his office. She asked to speak with him to discuss her complaint

10  memo dated May 3, 2016, so that he could hear directly from her why she had written it.

11  SAC Dawson invited Agent Bishop into his office, and they talked about her concerns and the

12  incidents reported in her memo. It was apparent from his behavior and remarks that

13  SAC Dawson was familiar with the contents of her memo.  Agent Bishop talked to SAC Dawson

14  about incidents outlined in her memo and how emotionally painful and tiring it had been for her

15  dealing with GS Devlin's abusive behavior over the years and that ATF never took action to stop

16  it.  She told SAC Dawson that the latest incidents in which Devlin had been harassing her were

17  completely unprofessional, and that he had not only defamed and bad-mouthed her *inside* the

18  Agency but also had inflicted harm by defaming her to others *outside* the agency, which could

19  interfere with her ability to perform her job effectively.  SAC Dawson agreed that GS Devlin had

20  probably harmed her professional reputation.  SAC Dawson then told her that he had been the

21  class coordinator when GS Devlin was a new hire at the academy.  SAC Dawson told her that

22  GS Devlin "had issues" even then and stated "Devlin has always been a separatist" racially.

23  5.25   On or about May 5, 2016, Agent Bishop was speaking with ASAC Nunez just

24  outside the door of ASAC Nunez's office about Bishop's May 3, 2016 complaint memo.

25  ASAC Nunez said that SAC Dawson had told her, "Devlin does not like black people."

26

27

COMPLAINT - 11

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

11256.01 ni086703

5.26    The next day, May 6, 2016, ASAC Nunez and SAC Dawson spoke to GS Devlin, who confirmed that he wears a "German Eagle SS lightning bolt tattoo" that he received to work undercover with a white supremacist organization.

**History of ATF's Retaliation Against Ms. Bishop**

5.27    In her previous federal lawsuit, Plaintiff alleged that in retaliation for her alleging race discrimination and harassment by GS Devlin, the Agency undermined her promotional detail by stripping her of her specialty position as canine handler and by notifying her that upon returning from ATF headquarters she would have to relocate to Portland, Oregon, where she would have to have frequent interaction with GS Devlin, and to face the prospect of him periodically supervising her.  As a result, Plaintiff did not go on the promotional detail and was deprived of both the professional development that it would have entailed and the stepping stone to advancement that it would have created.

5.28    As a result of Plaintiff's prior EEO complaints and federal lawsuit, ATF did not discipline GS Devlin or any employee.

5.29    In her prior lawsuit, Plaintiff had alleged:

> Defendant failed to remedy and prevent the racial harassment that Agent Bishop was and is subjected to in her workplace.  And Defendant discriminated and retaliated against her for reporting that harassment, altering the terms and conditions of her promotional detail.  Completing an assignment at ATF HQ is a requirement for promoting to grade GS15.  Defendant's conduct illegally interfered with Agent Bishop fulfilling that requirement causing her harm.  And, Defendant's conduct illegally proximately caused her other financial harm and emotional distress.

*Bishop v. Sessions*, No. C18-00599-TSZ, Dkt. 1, ¶ 5.42.

5.30    ATF's failure to timely remedy and prevent the discrimination, harassment, and retaliation that Plaintiff alleged in her prior lawsuit is material evidence relevant to proving GS Devlin's illegal motivations, notice to Defendant, failure of Defendant to promptly remedy and prevent illegal conduct, Defendant's illegal motivation and conduct, and that these were proximate causes of GS Devlin's violations after the resolution of Ms. Bishop's first lawsuit alleged herein and the harm that they have caused Ms. Bishop.

COMPLAINT - 12

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

11256.01 ni086703

## VI.    CLAIMS

6.1     By his acts described above, Defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*., as amended and related regulatory provisions, through illegal harassment, discrimination, and retaliation causing harm and damages to Plaintiff.

## VII.    INJUNCTION ALLEGATIONS

7.1     Defendant has continued failure to take prompt and remedial measures to stop ATF employees from harassing, discriminating against, and retaliating against Plaintiff.   An injunction from this Court is necessary to enforce her rights under Title VII to be free of such mistreatment as an employee of the United States government.

## VIII.    REQUEST FOR RELIEF

WHEREFORE Plaintiff requests that the Court enter judgment and other relief against Defendants awarding Plaintiff:

8.1     Trial to a jury;

8.2     Declaratory and injunctive relief;

8.3     Economic and general damages;

8.4     The tax consequences of any award;

8.5     Reasonable attorney fees and costs;

8.6     Pre-judgment and post-judgment interest;

8.7     The right to conform the pleadings to the evidence presented at trial; and

8.8     All other relief deemed just and fair.

DATED this 17ᵗʰ day of September, 2020.

MacDONALD HOAGUE & BAYLESS

By: _____
Jesse Wing, WSBA #27751
JesseW@MHB.com
Attorneys for Plaintiff

COMPLAINT - 13

11256.01 ni086703

# EXHIBIT A

Bradford Devlin
July 08, 2019

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

CHERYL BISHOP,

                    Plaintiff,

          vs.

JEFF SESSIONS, ACTING ATTORNEY          Case No. C18-00599-TSZ
GENERAL, DEPARTMENT OF JUSTICE,
ALCOHOL, TOBACCO, FIREARMS &
EXPLOSIVES,

                    Defendant.

VIDEOTAPED DEPOSITION OF BRADFORD DEVLIN

July 8, 2019

9:51 a.m.

1000 SW Third Avenue, Suite 600

Portland, Oregon

REPORTED BY:

Melinda Hermansen

CSR No. 10-0420, RPR

Bradford Devlin
July 08, 2019

1   APPEARANCES:

2

3       For Plaintiff:

4           MACDONALD HOAGUE & BAYLESS
            MR. JESSE A. WING
5           705 2nd Avenue, Suite 1500
            Seattle, WA 98104-1745
6           (206) 622-1604
            Jessew@mhb.com
7

8       For Defendant:

9           UNITED STATES ATTORNEY'S OFFICE
            MS. PRISCILLA CHAN
10          MS. LILY MONFORT (Via telephone)
            700 Stewart Street, Suite 5220
11          Seattle, WA 98101-4438
            (206) 553-7970
12          Priscilla.chan@usdoj.gov

13

        Also Present:
14

            MR. ZACH HOOVER, Videographer
15

16

17

18

19

20

21

22

23

24

25

Bradford Devlin
July 08, 2019

1                    INDEX TO EXAMINATION

2

3              WITNESS:   BRADFORD DEVLIN

4    EXAMINATION                                   PAGE

5    By Mr. Wing                                     5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Bradford Devlin
July 08, 2019

1               INDEX TO EXHIBITS

2               BRADFORD DEVLIN

3               Bishop v. Sessions

4               Monday, July 8, 2019

5        Melinda Hermansen, CSR No. 10-0420, RPR

6

7   MARKED              DESCRIPTION              PAGE

8   (None)

9

10          EXHIBITS PREVIOUSLY MARKED AND REFERRED TO

11

12  MARKED              DESCRIPTION              PAGE

13  Exhibit 43    (Retained by Plaintiff's Counsel)    80

14  Exhibit 44    (Retained by Plaintiff's Counsel)    75

15

16

17

18

19

20

21

22

23

24

25

Bradford Devlin
July 08, 2019

1                PORTLAND, OREGON;

2           MONDAY, JULY 8, 2019, 9:51 A.M.

3

4           THE VIDEOGRAPHER:  We're on the record.  The

5     time is 9:51 a.m., on Monday, July 8th, 2019.  This

6     begins the video deposition of Bradford Devlin in the

7     matter of Cheryl Bishop v. Jeff Sessions, Acting

8     Attorney General, et al., being heard in the United

9     States District Court, Western District of Washington at

10    Seattle, case number C18-00599-TSZ.  This deposition is

11    being held at 1000 Southwest Third Avenue, Suite 600,

12    Portland, Oregon.  Your videographer is Zach Hoover, and

13    your court reporter is Linda Hermansen.  We're with US

14    Legal Support.

15           Will counsel please introduce yourselves one

16    more time for the record, and then the court reporter

17    will administer the oath.

18           MR. WING:  Jesse Wing on behalf of the

19    plaintiff, Cheryl Bishop.

20           MS. CHAN:  Priscilla Chan on behalf of

21    defendant.

22

23                BRADFORD DEVLIN,

24       having been first duly sworn, was examined

25               and testified as follows:

Bradford Devlin
July 08, 2019

1                    EXAMINATION

2   BY MR. WING:

3       Q.  Good morning.  My name is Jesse Wing, and I

4   represent Cheryl Bishop in a lawsuit that's been filed

5   against your employer, the United States Government.

6            Mr. Devlin, I'm going to do my best to phrase

7   questions in a way that you find understandable.  If at

8   any time you feel you do not understand a question or

9   you find it confusing, will you agree to let me know?

10      A.  Yes.

11      Q.  If you go to answer a question, I will assume

12  you understood it.  Fair?

13      A.  Fair.

14      Q.  Okay.  Is there any reason you cannot give

15  truthful testimony today?

16      A.  No.

17      Q.  Okay.  Do you understand that you are under the

18  oath, penalty of perjury, the same as if you were

19  sitting in front of a federal jury and a federal judge?

20      A.  Yes, I do.

21      Q.  Okay.  At any time you need a break, please let

22  us know.  We can take a break.  And as long as there's

23  not a question pending, we can go ahead and take a break

24  then.  Okay?

25      A.  Okay.

Bradford Devlin
July 08, 2019

1      Q.  All right.  What, if anything, did you do to

2  prepare for today's deposition?

3      A.  I met with -- with the attorney.

4      Q.  Priscilla Chan?

5      A.  Yes.

6      Q.  Okay.  About how long?

7      A.  Maybe an hour yesterday.

8      Q.  Okay.  Did you review any documents in

9  preparation for today?

10     A.  I did.  I looked at them.  I did not reread

11  them, but I have read them in the past.

12     Q.  Okay.  And what documents are you referring to?

13     A.  They were the EEO documents, and one was a

14  complaint originally written by Cheryl Bishop.  There

15  may have been another one in there.  I -- those are the

16  ones that come to my mind.

17     Q.  Okay.  And when you say "the EEO," do you mean

18  affidavits that you signed?

19     A.  Yes.

20     Q.  Is that what you mean?  Okay.

21     A.  Yes.

22     Q.  So you read a complaint written by Cheryl

23  Bishop, and you read statements that you had made and

24  signed?

25     A.  Yes.

Bradford Devlin
July 08, 2019

1      Q.   Any other documents?

2      A.   Not that I can think of, no.

3      Q.   Okay.  And you sort of saw those documents, but

4   didn't actually reread them?

5      A.   Correct.

6      Q.   Okay.  And during your conversation with

7   Ms. Chan, was anyone else present?

8      A.   No.

9      Q.   Was that over the phone or in person?

10     A.   We did talk over the phone, but we met in

11   person yesterday.

12     Q.   Okay.  Mr. Devlin, for the record, what is your

13   race?

14     A.   Caucasian.

15     Q.   And what is your gender?

16     A.   Male.

17     Q.   And you have filed at least one EEO complaint

18   yourself; is that correct?

19     A.   That's correct.

20     Q.   More than one or just one?

21     A.   Just one.

22     Q.   And when did you file that?

23     A.   It was after Cheryl had fired -- I'm sorry --

24   filed hers.  It was probably 2017, I believe.

25     Q.   Okay.  Is that matter resolved?

Bradford Devlin
July 08, 2019

1      A.   It was just recently resolved, yes.

2      Q.   Okay.  And what was the outcome?

3      A.   There was no outcome.  They -- I received a

4  letter saying that nothing was going to happen.

5      Q.   Okay.  So it's just been dropped.  Dismissed?

6      A.   I don't know what the terminology is.  I would

7  assume so, yeah.

8      Q.   Okay.  You have testified as part of your job;

9  is that correct?

10     A.   Yes.

11     Q.   Okay.  Apart from testifying as part of your

12  job as an ATF agent, have you ever testified in court

13  apart from that?

14     A.   No.

15     Q.   A personal matter?  A business matter?

16     A.   No, not in court.

17     Q.   What about in a deposition?

18     A.   Yes.

19     Q.   What was the nature of the dispute that you

20  testified in?

21     A.   It was an automobile accident that my daughter

22  was involved in.

23     Q.   Okay.  Any other times?

24     A.   No.

25     Q.   Okay.  And apart from the EEO declarations or

Bradford Devlin
July 08, 2019

1    affidavits that you signed regarding your own EEO

2    complaint and Cheryl Bishop's EEO complaints, have you

3    signed any other affidavits or declarations in EEO

4    matters?

5         A.   No.

6         Q.   Do you feel like you understand my question?

7         A.   Yes, I believe I do.  I haven't -- I haven't

8    signed any other declarations other than -- than the

9    complaints, my only EEO complaint or the one involving

10   Cheryl Bishop.

11        Q.   Okay.  Would you briefly provide a summary of

12   your career at the ATF; you know, when you started, what

13   roles you played, what the locations were.

14        A.   Yes.

15        Q.   Thank you.

16        A.   I was hired as an ATF agent in June of 1999.

17   My first -- my first place -- my first work station was

18   El Paso, Texas.  I spent four years -- three or four

19   years there.  I went from El Paso to Tacoma, Washington

20   as an agent.  I worked Seattle and Tacoma, Washington

21   area.  I was an agent for about nine years.

22        I was promoted to the resident -- or, I'm

23   sorry, the group supervisor job in -- I believe it was

24   2007, late 2007.  That was the gang group in Seattle,

25   Washington.  Then I spent three, four years in a Seattle

Bradford Devlin
July 08, 2019

1   gang group.  Then I accepted a position as the Resident

2   Agent in Charge of the Portland, Oregon field office.

3   And I -- I was in Portland as the Resident Agent in

4   Charge until 2015.  And then I opened the office in

5   Eugene, Oregon as the Resident Agent in Charge.  And

6   I've been in Eugene since.  I currently hold that

7   position and reside in Eugene.

8        Q.  Approximately when -- thank you.  When in 2015

9   did you open the Eugene office?

10       A.  Summertime.  I would say probably -- probably

11  July or August.

12       Q.  Okay.  Was that -- did you volunteer to open

13  the Eugene office?

14       A.  I had a couple of options.  I was being heavily

15  recruited to go to Washington, D.C.  I wasn't interested

16  in going to Washington, D.C.  At the same time, for

17  several years while I was in Portland, I had requested

18  an office be -- be initiated in Eugene, Oregon to cover

19  Central and Southern Oregon, and it took several years

20  for ATF to -- to give that -- to give the blessing for

21  that.  So they -- so I was -- I was offered the option

22  of going to Eugene and opening a new office, and I

23  accepted that over going to Washington, D.C.

24       Q.  Okay.  Were you being pushed to do one or the

25  other?

Bradford Devlin
July 08, 2019

1      A.   I was being highly encouraged, I wouldn't say

2   pushed, to go to Washington, D.C.

3      Q.   For what reason?

4      A.   Because I had been a low level supervisor for

5   quite a -- quite a few years.  And ATF's -- ATF's or

6   management's belief was if you've been a supervisor for

7   more than five years, you should -- you should promote

8   up.  And the next step would be to go to

9   Washington, D.C.

10     Q.   Okay.  So it was the Seattle office management

11  that was pushing you to go to D.C.?

12     A.   Yes.

13     Q.   Okay.  Or opening Eugene?

14     A.   That's correct.

15     Q.   Okay.  But you saw either one as an effort by

16  your management to promote you; is that right?

17     A.   The Eugene position was not a promotion.

18     Q.   Okay.

19     A.   It was just a lateral.

20     Q.   Okay.  Okay.  So when did you do the academy?

21     A.   The ATF Academy was June of 1999.

22     Q.   And was ███████████ one of the instructors that

23  you had in the academy?

24     A.   He was a -- I wouldn't call it an instructor.

25  He was a supervisor of the academy class, a visiting

Bradford Devlin
July 08, 2019

1     supervisor.

2          Q.  Okay.  And was ▮▮▮▮▮▮▮ one of your

3     classmates?

4          A.  ▮▮▮▮▮▮▮ that name sounds familiar.  I don't

5     remember if ▮▮▮▮▮▮▮ was a classmate.

6          Q.  You just don't remember?

7          A.  No, but that name does sound familiar.

8          Q.  Okay.  During the course of your career, you

9     went undercover in a gang; is that right?

10         A.  Yes.

11         Q.  More than once or once?

12         A.  More than once.

13         Q.  More than once.  Okay.  Could you articulate

14    the time periods that you went undercover?

15         A.  I'll do my best.  I'm not real good with years.

16         Q.  Okay.

17         A.  I was part of -- it was called the Enhanced

18    Undercover Program.

19         Q.  Could you spell that please?

20         A.  Enhanced --

21         Q.  Oh, thank you.

22         A.  E-N-H --'          ᵗ

23         Q.  I got it.

24         A.  Okay.  Enhanced Undercover Program.  I became

25    part of that program, I would say in about 2003 or '04,

Bradford Devlin
July 08, 2019

1    and I was in that program for about three or four years.

2        Q.  Was it at the end of that that you became the

3    supervisor in Seattle?

4        A.  I first became a supervisor in Seattle in 2007.

5        Q.  So was that right after?

6        A.  It was -- yes, yes.

7        Q.  Okay.  And you performed more than one

8    undercover operation?

9        A.  Yes.

10       Q.  How many would you say you did?

11       A.  Probably hundreds.

12       Q.  Okay.  And I understand one of them is called

13   the Order of Blood; is that right?

14       A.  Yes.

15       Q.  Okay.  Tell me a little bit about the Order of

16   Blood.

17       A.  Order of Blood is an Aryan-Nation-sponsored

18   outlet motorcycle club.  It was based in Ohio.  And

19   there were three full-time ATF undercover agents that

20   were able to -- to get in.  I was one of the three.  I

21   was able to get membership in it.

22           It was a -- it was a lengthy criminal case.  I

23   was undercover on that case for probably eight months.

24   It was -- it was very successful at the end.  We had --

25   we had a lot of arrests.

Bradford Devlin
July 08, 2019

1      Q.   Congratulations.

2      A.   Thank you.

3      Q.   I don't want to know a whole lot of the

4   specific details, but some general details would be

5   helpful.

6           Did you go out of state to do this undercover

7   work?

8      A.   Yes.  It was in Ohio.

9      Q.   You did go to Ohio?

10      A.   Yes.

11      Q.   Okay.  And did you essentially live with these

12   bikers?

13      A.   Yes.

14      Q.   So this was kind of a 24/7 lifestyle that you

15   had to adopt?

16      A.   Yes.

17      Q.   Okay.  And you mentioned that they were Aryan.

18   Is that another phrase -- another word for a white

19   supremacist?

20      A.   The Aryan is a group.

21      Q.   Okay.

22      A.   They call themselves Aryans, but yes, they are

23   white supremacists.

24      Q.   And during the course of your undercover

25   operations, did you have to participate in activities

Bradford Devlin
July 08, 2019

1    that one would describe as white supremacist?

2       A.  I participated in -- in their -- their talk,

3    their -- their culture.  I didn't participate in any --

4    what kind of activities are you --

5       Q.  I'm not asking you if you committed crimes.

6       A.  Oh, I didn't think so.  Okay.

7       Q.  I'm -- the KKK is known for burning crosses.

8       A.  Uh-huh.

9       Q.  Do the Order of Blood engage in rituals that

10   they think express white supremacist --

11       A.  No.

12       Q.  -- beliefs?

13       A.  No, no.  There was no rituals.

14       Q.  Okay.

15       A.  It was an outlaw motorcycle club.  Their

16   biggest -- their biggest ritual, if you call it, was

17   they wore what is called a "cut."  It's the -- it's the

18   biker vest and it has their clothing insignia on it, and

19   they like to put racist patches on it to show that they

20   are part of the Order the Blood, to show that they are

21   Aryan -- Aryan Nation.  And they want to show that to

22   everybody.

23       And they talk -- they talk racist comments.

24   And they'll -- they'll make loud and obnoxious

25   statements to -- to minorities and not think anything of

Bradford Devlin
July 08, 2019

1    it.

2         Q.  And did you have to engage in the same behavior

3    in order to fit in?

4         A.  Yes.

5         Q.  Okay.  And, for example, did that mean using

6    the N word?

7         A.  I didn't use the N word, but some of them would

8    use the N word, yes.

9         Q.  Okay.  During the course of this undercover

10   operation, did you get a tattoo?

11        A.  Yes.

12        Q.  And why did you get a tattoo?

13        A.  The tattoo was -- was required by the club as

14   part of the bylaws of the club when you get voted in as

15   a member.  So I had to -- I had to -- to go through a

16   probationary period, just like any -- it was called a

17   prospect.

18        So if you're a prospect, you prospect with the

19   club for a certain amount of time.  And when they feel

20   that you have -- have passed this time period, and if

21   they like you, they will have a vote and they will vote

22   you in as a member.  And once you are a member, they --

23   they gave you the approval to get the club insignia

24   tattooed and -- and many other tattoos if you -- if you

25   wish.  So once I was voted in, I was told to get the

Bradford Devlin
July 08, 2019

1    tattoo, the club tattoo.

2        Q.   Okay.  And what is the tattoo?

3        A.   It's a German eagle with SS bolts in the

4    center.

5        Q.   What is an SS bolt?

6        A.   It's part of Hitler's secret police.  It

7    signifies support for Hitler.

8        Q.   Okay.  Was there Hitler talk among the group?

9        A.   Yes.

10       Q.   Okay.  Support for Hitler, in other words?

11       A.   Yes.

12       Q.   Okay.

13       A.   Yes.

14       Q.   And you still have that tattoo; is that

15   correct?

16       A.   Yes.

17       Q.   I'd like to see it, please.

18       A.   Okay.  I got to take off my --

19       Q.   Yeah.

20       A.   -- shirt.

21           MS. CHAN:  And, Counsel, for the record, it's

22   just subject to the objections that we sent you.

23           Go ahead.

24   BY MR. WING:

25       Q.   Let me just ask you first.  Do you have any

123

Bradford Devlin
July 08, 2019

1   other tattoos?

2      A.  No.

3      Q.  That's what I thought.  Okay.

4      A.  (Undressing.)  I shouldn't have worn short

5   sleeves today, huh?

6         MR. WING:  Take your time.  We're doing fine.

7   So -- this doesn't have to be on the record.

8         There we go.  Okay.  I'm going to take a

9   picture of that.

10        (Picture taken with cell phone)

11  BY MR. WING:

12      Q.  So let me ask you.  I see the lightning bolts

13   in the center shield --

14      A.  Uh-huh.

15      Q.  -- is that right?

16      A.  Yeah.

17      Q.  Okay.  And could you describe -- it looks like

18   an eagle --

19      A.  Yes.

20      Q.  -- is that right?

21      A.  Yes.

22      Q.  And is there anything else about the eagle

23   that's specifically important in the insignia?

24      A.  Other than it's supposed to be a German eagle.

25   I don't know if there's a difference between a German

Bradford Devlin
July 08, 2019

1   eagle and an American eagle.  I -- I don't know.

2        Q.  Okay.  All right.  Let me just check my

3   pictures and make sure that I got them.

4        A.  Got it?

5        Q.  Okay.  Yeah.  Thank you.

6        A.  Yes.

7             MS. CHAN:  Can we take a couple-minute break?

8             MR. WING:  Sure.

9             MS. CHAN:  Okay.  Why don't we take a

10  couple-minute break --

11            THE WITNESS:  Okay.

12            MS. CHAN:  -- if you want to --

13            THE WITNESS:  Yeah.

14            THE VIDEOGRAPHER:  Off the record at 10:11.

15            (Recess)

16            THE VIDEOGRAPHER:  Back on the record at 10:16.

17  BY MR. WING:

18       Q.  This is just curiosity.  Hopefully you'll

19  indulge me.  I'm from Ohio.

20            Where in Ohio was all this?

21       A.  Geneva Lake.

22       Q.  Oh, okay.

23       A.  By Ashtabula.

24       Q.  Uh-huh.  Okay.  Thank you.

25            Do you have a photograph of you and members of

Bradford Devlin
July 08, 2019

1    the gang?

2         A.   I do have one, yeah.  Actually, I have -- I

3    have several.

4         Q.   You have several.  Okay.

5         A.   Yeah.

6         Q.   And one of them sits in your office; is that

7    correct?

8         A.   Sits in a drawer in my office, correct.

9         Q.   Okay.

10        A.   It did sit on -- on a ledge of my office for

11   some time, yes.

12        Q.   Okay.  And you must have gotten to know some of

13   these people pretty well?

14        A.   Yes.

15        Q.   Did you see good sides of them?

16        A.   Sometimes I did, yes.

17        Q.   And have you ever described them as good

18   people, people that you got to know?

19        A.   No, but I have described them as -- one of the

20   difficult things about working undercover with a group

21   of people for a long time, I have described them as --

22   as getting to know them and building a trust, and then

23   when the case is over, I tear that trust down.  I have

24   described that.

25        Q.   Okay.  Are you proud of the tattoo?

Bradford Devlin
July 08, 2019

1      A.  No.

2      Q.  Why do you still have it?

3      A.  I'm waiting for my EEO complaint, which just

4  recently finished, just about a month or two months ago,

5  and I have asked ATF to pay to remove it.

6      Q.  Okay.  Why have you waited until now?  I mean

7  you've had the tattoo since -- for close to 15 years; is

8  that about right?

9      A.  Yes, yes.

10     Q.  Okay.  Why now?

11     A.  Because I want ATF to pay to remove it.

12     Q.  They have offered to pay for it, right?

13         MS. CHAN:  Object to the form.  It assumes

14  facts not in evidence.  Answer if you know.

15         THE WITNESS:  They -- they have -- one of my

16  supervisors did say we could find a way to -- to have

17  ATF remove it.  And I said, "Okay.  I'll get back with

18  you."  And when I asked to have it done, she never got

19  back with me.

20  BY MR. WING:

21     Q.  Is that ████████████

22     A.  Yes.

23     Q.  Okay.  Did you ask ████ in person or via e-mail

24  or text?  Or how did you ask?

25     A.  I believe it was in person.

Bradford Devlin
July 08, 2019

1        Q.  Did you -- how many years ago was that?

2        A.  That was when Cheryl's complaint -- when Cheryl

3   submitted a complaint, because ▓▓▓ had asked me about

4   that -- about the tattoo.  I believe ▓▓▓ had asked me.

5   ▓▓▓ said, "Well, you have a swastika tattoo."

6            I said, "It's not a swastika."  Then I asked

7   ▓▓▓ if I could get it removed.  I also asked to get it

8   removed prior to that, right after that criminal case

9   had ended, and I was told "no."

10       Q.  Who did you ask about that?

11       A.  I asked the chief of Special Operations

12   Division.  But I asked through the supervisor of the

13   Enhanced Undercover Program.

14       Q.  Do you remember that person's name?

15       A.  Uh-huh.

16       Q.  Who is that?

17       A.  ▓▓▓▓▓▓▓

18       Q.  Could you spell that, please?

19       A.  ▓▓▓▓▓▓▓.

20       Q.  And I just want to be sure it's a hyphen, not

21   apostrophe?

22       A.  Oh.  Yeah.

23       Q.  It was an apostrophe?

24       A.  That's an apostrophe.  I'm sorry.  I have

25   hyphen, apostrophe wrong.

Bradford Devlin
July 08, 2019

1     Q.   A hyphen is like a minus sign.

2     A.   It's not a hyphen.  I'm sorry.

3     Q.   Okay.

4     A.   It's an apostrophe.

5     Q.   Okay.  How much did it cost to remove a tattoo

6     like that?

7     A.   This one costs between three and four thousand

8     dollars.

9     Q.   Okay.  I mean, to remove it?

10    A.   Yeah, through the laser process, the laser

11    removal process.

12    Q.   Okay.  When is the last time before today that

13    you've shown that tattoo to anybody?

14    A.   It would have been many years ago.  It would

15    have been at a -- I believe it was a retirement party in

16    Seattle.  One of my coworkers had asked.  He said he had

17    heard about my tattoo, and he had asked to see it.  And

18    I showed it to him.

19    Q.   Was this in a room where the rest of the guests

20    were, too?

21    A.   Yes.

22    Q.   Okay.  So did you have to disrobe the way you

23    just did?

24    A.   No.  I lifted up my -- my -- my sleeve.

25    Q.   Okay.  Do you remember Cheryl Bishop being

Bradford Devlin
July 08, 2019

1    there during that?

2         A.  I think I do, yes.

3         Q.  Okay.

4         A.  There was many people there, but I believe she

5    was part of that -- that party.

6         Q.  Do you have an understanding why some people

7    might be disturbed to see that?

8         A.  Yes.

9         Q.  Did that occur to you when you were showing

10   that to your colleague at the party --

11        A.  No.

12        Q.  -- that others might find it offensive?

13        A.  No.  Because he asked to see it, and I -- I

14   didn't -- I didn't believe -- have any reason to believe

15   that he would be offended.

16        Q.  You knew that there were other people around

17   who would see it, too, right?

18        A.  I wasn't showing it to other people.

19        Q.  Your kids have seen the tattoo?

20        A.  Unfortunately, yes.

21        Q.  What do you tell them about it?

22        A.  I tell them the truth.  I tell them how I

23   acquired it and the circumstances.

24        Q.  The other two ATF agents who were undercover in

25   the -- with the Blood gang also got that tattoo, right?

Bradford Devlin
July 08, 2019

1     A.  Correct.

2     Q.  Okay.  Do they still have it?

3     A.  I don't know.

4     Q.  Did you tell ▆▆▆▆▆ that you would get

5  yours removed once they got theirs removed?

6     A.  No.

7     Q.  So if ▆▆▆ testified to that under oath, she was

8  not telling the truth?

9     A.  Correct.

10        MS. CHAN:  Object to the form.

11  BY MR. WING:

12     Q.  Is that right?

13        MS. CHAN:  Object to the form.  Answer if you

14  know.

15        THE WITNESS:  That's -- I never said that.

16  BY MR. WING:

17     Q.  Okay.  Who are those agents, the other two

18  agents?

19     A.  They're -- they're two other ATF agents that I

20  work --

21     Q.  What were their names?

22     A.  -- long-term cases.

23        ▆▆▆▆▆▆▆

24     Q.  ▆▆▆▆▆▆▆▆▆▆

25     A.  I think it's a ▆▆

Bradford Devlin
July 08, 2019

1      Q.   Okay.  And ███████████

2      A.   Yes.  And let me think.  For some reason, his

3  name's not coming to me.  Give me a minute or two.  It

4  will probably come to me.

5      Q.   Okay.

6      A.   Sometimes I forget names pretty -- pretty

7  easily.

8      Q.   Okay.  Do you stay in touch with these guys?

9      A.   Not very much.  I stay in touch with ████████

10  I probably talk to him once or twice a year.

11      Q.   And you don't remember the topic coming up of

12  removing the tattoo?

13      A.   No, no.

14      Q.   Where is he located?

15      A.   You mean with ████████

16      Q.   No, with ███████  Do you guys ever talk

17  about --

18      A.   I don't --

19      Q.   -- did you get the tattoo removed?

20      A.   No.  But I don't remember ever talking about

21  removing a tattoo of mine or his.

22      Q.   Okay.  Do you remember the other guy's name

23  yet?

24      A.   Yeah.  Let me --

25      Q.   Okay.

Bradford Devlin
July 08, 2019

1        A.   He was the one I had the picture of on my desk.

2        Q.   Okay.   When did you first meet Cheryl Bishop?

3        A.   I believe I met Cheryl when I first came to

4    Seattle Field Division, and that was about 2002.

5        Q.   Okay.   And at that point, you were both -- is

6    it called 1811 agents --

7        A.   Yes, that's correct.

8        Q.   -- is that right?   Okay.

9             And then she left the agency, right, and you

10   continued in Seattle for a while?

11       A.   Yes.

12       Q.   Okay.   Did you work with her before she left to

13   go to Amazon?

14       A.   No.

15       Q.   Okay.   She was just a fellow agent in the

16   Seattle office?

17       A.   Yes.

18       Q.   Okay.   At that time, if you were going to

19   estimate, how many agents would you say were in Seattle,

20   just your estimate?

21       A.   Just in the Seattle --

22       Q.   Office.

23       A.   -- office?

24       Q.   Not the whole field.

25       A.   Not the division, just the office?

Bradford Devlin
July 08, 2019

1      Q.   Yes.

2      A.   I would say maybe 20.

3      Q.   Okay.   And approximately how long do you think

4   that you and she worked in the same office together

5   before she left?

6      A.   Well, we didn't -- I'm not for sure.   I don't

7   remember.   I believe that she may have been leaving at

8   the time that I came on.   And I may have even met her at

9   a going-away party for someone else at the time that I

10  was coming on and the time she was leaving.   I

11  don't -- I don't remember.

12     Q.   So would it be accurate to say you don't really

13  remember much about the time when you and she worked

14  together before she left for Amazon?   And when I say

15  "worked together," I just mean worked in the same

16  office.

17     A.   Correct.

18     Q.   You didn't really have much sense of her at

19  that point?

20     A.   Correct, and we never worked any criminal cases

21  together.

22     Q.   Okay.   And when is the next time you had any

23  contact with her?

24     A.   When she came back to ATF.   She came to the

25  gang group, which was a group I supervised.

Bradford Devlin
July 08, 2019

1      Q.  And how did you find out that she was

2   returning?

3      A.  My supervisor informed me.

4      Q.  Who was your supervisor at that time?

5      A.  ████████████

6      Q.  He was your ASACH?

7      A.  Yes.

8      Q.  Okay.  And were you surprised she was

9   returning?

10     A.  No.  I -- no.

11     Q.  Okay.  Did you ask him not to put her in your

12  group?

13     A.  Yes.

14     Q.  Why?

15     A.  Because of her reputation.  She had a poor

16  reputation.

17     Q.  What did she have a reputation for?

18     A.  Of not being a worker.

19     Q.  Could you explain what you mean by that?

20     A.  Not being aggressive towards obtaining and

21  investigating criminal cases as some of the other agents

22  were.

23     Q.  And when you say she had this reputation, since

24  you didn't work with her, where did you get that

25  information?

Bradford Devlin
July 08, 2019

1      A.  From other coworkers.

2      Q.  And those coworkers told you this when she was

3   returning?  Because you didn't have a sense of her

4   before she left, did you?

5      A.  'No.  I -- I believe I had heard that at the

6   time that she had left.

7      Q.  Who do you remember hearing that from?

8      A.  Oh, I -- probably a handful of people.  I don't

9   remember names.

10      Q.  A handful of people --

11      A.  That was a long time ago.

12      Q.  A handful of people would have been like a

13   quarter of the office, right, if there were 20 agents

14   there?

15          MS. CHAN:  Object --

16   BY MR. WING:

17      Q.  A handful would be five --

18          MS. CHAN:  Object to the form.

19   BY MR. WING:

20      Q.  -- is that about right?

21          MS. CHAN:  Answer if you know.

22          THE WITNESS:  A handful to me would be three to

23   five, or more.

24   BY MR. WING:

25      Q.  And essentially your description of her having

Bradford Devlin
July 08, 2019

1    a poor reputation is that she didn't work hard.

2         Is that a fair summary or is it different than

3    that?

4         A.  It's that and -- and more.

5         Q.  Please explain.

6         A.  I think the "more" would be I think her

7    attitude would precede her.  Some people had a hard time

8    working with her based, from my understanding, primarily

9    on personality differences.

10        Q.  What did you understand those kind of

11   personality differences to be?

12        A.  I didn't have an understanding of them.  I had

13   never worked with her.  I had just heard the

14   conversations through other people.

15        Q.  Did they say that she was quiet or loud

16   or -- you said she wasn't aggressive in getting cases.

17   What kind of personality differences did you understand

18   there to be?

19        A.  The personality differences that I understood

20   would be that she was bossy.  I think I remember hearing

21   someone describing her as being pushy or bossy.  I don't

22   remember any other specific characterization of her, of

23   her character.

24        Q.  At the time that she came back to work in

25   ATF -- which is about what year?  2009?

Bradford Devlin
July 08, 2019

1        A.  Yeah.  It could have been 2008, 2009.

2        Q.  Okay.  -- was the office about the same size,

3    about 20 agents?

4        A.  It may have been a little bigger because we had

5    the -- the gang group had been formed then, and that was

6    another 68 agents.

7        Q.  So it may have been more like 25 to 30?

8        A.  As a guess, yes.

9        Q.  Okay.  What did ████████████ tell you about

10   Cheryl Bishop?

11       A. ██████ told me that she was coming back to work.

12   ████ also told me that based upon her lawsuit to come back

13   to ATF, ██████ told me that she had a -- I guess it was a

14   privilege, he called it, a right of -- a right of

15   refusal; a right of first refusal, maybe.  And ████ told

16   me that she could select what group she wanted to come

17   to, and that she had selected my group, the gang group.

18       Q.  So ████ was telling you you were stuck with her?

19       A.  Yes.

20            MS. CHAN:  Object to the form.  Go ahead and

21   answer.

22            THE WITNESS:  And that's when I asked if --

23   based upon her reputation, I would rather her not come

24   in my group.

25   / / /

Bradford Devlin
July 08, 2019

1    BY MR. WING:

2        Q.  What did ▓ say about your perception of her

3    reputation?

4        A.  I don't remember what ▓ said about -- I didn't

5    ask. ▓ didn't, I don't believe say, anything about my

6    perception of her reputation, but ▓ said she was coming

7    to my group.

8        Q.  Did ▓ say she was a good agent?

9        A.  No.

10       Q.  Did ▓ --

11       A.  ▓ didn't say she was a bad agent or a good

12   ►agent.  I don't -- I don't remember any comments,

13   positive or negative, from ▓▓▓▓▓.

14       Q.  Did you tell ▓ why you didn't want her to

15   work in your group?

16       A.  No.  I think ▓ just understood based upon

17   prior reputation.  I didn't explain anything to ▓.  I

18   don't remember ▓ asking for an explanation, either.

19       Q.  Okay.  You can tell visually that Cheryl Bishop

20   is African American; is that right?

21       A.  Yes.

22       Q.  Okay.  And when you mentioned that ▓▓▓▓▓

23   told you about her lawsuit, did he tell you that it

24   was -- what kind of lawsuit it was?

25       A.  No.

Bradford Devlin
July 08, 2019

1      Q.  But you understood --

2      A.  He -- he may have told me it was an Equal

3  Employment Opportunity lawsuit.  He may have -- I don't

4  remember exactly what he said.

5      Q.  Okay.

6      A.  Or if ▓▓ did say anything. ,

7      Q.  That was your impression?

8      A.  I did know --

9      Q.  Was that your impression, that it was an EEO?

10     A.  For some reason it is my impression, but I

11  could be wrong on that.  I don't know.

12     Q.  So you -- she joined your team, your group, the

13  gang group.  And is it true on the very first day, that

14  you sent her out on a mission even though she told you

15  she did not have a bulletproof vest?

16     A.  I don't remember that, no.

17     Q.  Does that mean it didn't happen or you just

18  don't remember it?

19     A.  I don't remember that.  What was the mission

20  she's alleged?  I wouldn't -- if I knew she had -- if

21  she -- if she didn't have a bulletproof vest and I knew

22  that, I wouldn't -- I wouldn't intentionally send her

23  out on a deal -- on something that I thought she would

24  be hurt or not protected.

25     Q.  That would be unsafe, right?

Bradford Devlin
July 08, 2019

1      A.  Yes.

2      Q.  Okay.  So you're not saying it didn't happen;

3  you just don't remember it; is that correct?

4      A.  That's correct.  Actually, I will say it didn't

5  happen because if I knew she didn't have a bulletproof

6  vest, I wouldn't have sent her out to be in harm's way.

7      Q.  You don't ever remember her telling you that

8  she did not have a bulletproof vest, at any time?

9      A.  No, I don't remember that.

10      Q.  What is your best understanding of what this

11  lawsuit is about?

12      A.  My understanding is that she is suing based

13  upon -- she believed my -- my comments, my communication

14  to her was made to her based upon her race.

15      Q.  Which comments?

16      A.  Which comments that I made?  Is that what

17  you're asking me?

18      Q.  Yes.

19      A.  That I called her a train wreck, that I

20  referred to her as a train wreck.  And that I -- and

21  that I -- I sent cartoon jokes to the group that she

22  felt was offensive.

23      Q.  Okay.  Who did you call her a train wreck to?

24      A.  Some U.S. Attorneys that I was speaking to.

25      Q.  Who are they?

Bradford Devlin
July 08, 2019

1          A.   They were in Eugene.   There was two or three of

2     them standing there.   One was ▓▓▓▓▓▓▓▓▓ (phonetic).

3          Q.   Would you spell that, please?

4          A.   I don't know how to spell it.   I believe it's

5     ▓▓▓▓▓▓▓▓▓▓   I'm sorry.   ▓▓▓▓ - I don't know.

6          Q.   Okay.

7          A.   I don't know.

8          Q.   All right.   And who are the other two or three?

9          A.   I honestly don't remember.   I remember we were

10    standing in a hallway.   One may have been -- I'm trying

11    to think of his name.

12         Q.   Can you describe him?

13         A.   He's an older gentleman.   He's getting ready to

14    retire.   He's in Eugene.   He does all of our career

15    criminal cases.   If I heard his name, I could tell you.

16         Q.   Okay.

17         A.   And then the third person, it may have not been

18    an AUSA.   It may have been one of the other assistants,

19    with the legal assistant there.   I don't remember who it

20    was.

21         Q.   I don't quite understand what you mean, "a

22    little assistant there."

23              For the U.S. Attorney's office?

24         A.   Yes.

25         Q.   Okay.

Bradford Devlin
July 08, 2019

1       A.   Yes.  I don't -- I don't remember who that

2   third person was.

3       Q.   A man or a woman?

4       A.   I don't remember.  It could be a woman.

5       Q.   The two AUSAs that you know you spoke to, those

6   were both men?

7       A.   Yes.

8       Q.   Okay.  And how did this come up, that you told

9   them that she was a train wreck?

10       A.   There was a prospect of me leaving Eugene to go

11   to Washington, D.C. for another position, and they had

12   asked me -- I was -- I was away from the office for a

13   week or two, and Cheryl Bishop had came down to be the

14   acting supervisor for Eugene.

15           And after I had got -- after her acting

16   supervisor time was -- was complete and I had returned

17   to Eugene, they had asked me, "Is Cheryl Bishop" -- "who

18   is Cheryl Bishop and is she going to be good for Eugene?

19   What's she like?"  They said, "What's she like?"  And I

20   told them she was a train wreck.

21       Q.   Okay.  And did they ask you what you meant?

22       A.   Yeah.  They may have asked something further.

23   They may have asked, "What do you mean by that?"

24           I believe I replied, "She has very

25   little" -- "very little experience, very little street

Bradford Devlin
July 08, 2019

1    experience."

2        Q.  Did you say anything else?

3        A.  No.  It was a very short conversation.

4        Q.  Did they seem dismayed --

5        A.  No.

6        Q.  -- to hear that -- you -- you said they asked,

7    "Is she going to be good for Eugene?"

8        A.  Yes.

9        Q.  Why did they think that she would be in Eugene?

10       A.  They had heard that she was interested in the

11   supervisor job in Eugene, replacing me.  They had heard

12   that she was interested and may put in for that

13   position.

14       Q.  Okay.  And the message you gave them was if she

15   does take that job, that will be bad news for Eugene?

16           MS. CHAN:  Object to the form.  Answer if you

17   know.

18           THE WITNESS:  The message I gave them was

19   simply, "She's a train wreck."  I didn't -- I didn't

20   describe it any further.

21   BY MR. WING:

22       Q.  Why did you choose to describe her as a train

23   wreck?

24       A.  That was an -- that was an accurate description

25   for me.

Bradford Devlin
July 08, 2019

1      Q.   Okay.  You've described that you thought she

2   had little street experience, and that some people

3   thought she was bossy, and that she wasn't aggressive on

4   getting criminal cases.

5           Does that all amount to a train wreck or is

6   there more?

7      A.   Well, in my mind, there's more.

8      Q.   Please explain.

9      A.   I think that reputation is very important in

10  law enforcement.  And I -- I knew that before she came

11  to my group, her -- her reputation was poor.  And then

12  when she -- when she arrived in my group, she

13  worked -- I was her supervisor for -- I'm guessing about

14  a year, maybe a little bit more.  She didn't have many,

15  if any, cases on her own.

16          I remember one significant case, the only one

17  that she worked was one that another agent worked prior

18  to her, and I had transferred it to her.  But I do

19  remember Cheryl completing that case and -- and doing

20  fairly well when she got that case.

21          The other point that stands out in my mind

22  is -- is the other agents in the group had -- had a

23  difficult time getting along with her, or maybe she had

24  a difficult time getting along with them.

25      Q.   In what way?

Bradford Devlin
July 08, 2019

1      A.  She was bossy.  She would try to tell them how

2   to do their job, many of which had many, many years of

3   experience and were very, very competent.

4      Q.  Did they complain to you?

5      A.  A couple of them did, yes.

6      Q.  Did you go to Cheryl and say, "Knock it off.

7   Your colleagues think you're bossy"?

8      A.  No, no.

9      Q.  Did you give her any feedback?

10     A.  I remember giving her feedback about a report

11  she wrote one time.  I tried to give her opportunities

12  to work so that I could see what she could do.  And I do

13  remember giving her positive feedback one time about a

14  report that she had written.

15     Q.  Okay.  Did you ever go to your ASACH and say,

16  "Cheryl's a train wreck.  What do I do with her?"

17     A.  No.

18     Q.  Why not?

19     A.  I felt I could work with her.

20     Q.  Did there come a time when you quite literally

21  got in her face when she was in your office?

22     A.  No, I didn't get in her face.  She -- that was

23  a time where there was -- I don't even remember what the

24  dispute was.  But I had sent an e-mail out about

25  gossiping, about talking negatively about other people,

Bradford Devlin
July 08, 2019

1    and I believe it may have been something about the

2    assignment of a government car.  But it involved the

3    Portland group, the Portland enforcement group.  And I

4    don't remember all the details on it, but I remember a

5    couple of people that said, "Hey, this is" -- you know,

6    "this is kind of getting out of hand.  There's just

7    some" -- "some gossip and some talk, and it's" -- "it's

8    not good."

9          So I sent an e-mail out to the group, included

10   Cheryl in it, suggesting that they stop -- they stop the

11   gossiping, and if there's any -- if they had any issues,

12   to work with those agents who they had issues with; try

13   to work it out themselves first, and if not, they could

14   come to me.

15         Cheryl had came into my office and -- and had

16   leaned over my desk and had demanded that I -- that I

17   talk about this with her, and that she know why I sent

18   her the e-mail.  And I immediately said, "I'm not going

19   to do that.  It's none of your business."

20         And I did that mostly because of the way that

21   she approached me and her demeanor.  I wasn't going

22   to -- I wasn't going to put up with it.  And she --

23         Q.  Go ahead.

24         A.  She -- she -- she said she demanded to know

25   what it was, and that if I sent her the e-mail, that

Bradford Devlin
July 08, 2019

1    she -- she needed to know.  And she -- she actually put

2    her hands on my desk and leaned over to me -- leaned

3    over towards me.  And when she did that, I -- I stood up

4    and I said, "Get the hell out of my office."

5         Q.  Did you come around from your desk?

6         A.  I may have -- it was an L-shaped desk.  I may

7    have come around the L side, yes.

8         Q.  And did you walk up to her face to face?

9         A.  No closer than you and I.

10        Q.  And would you say that's a couple feet?

11        A.  Yeah, probably 3 feet.

12        Q.  Did you raise your hand?

13        A.  I may have pointed to the door.  I may have

14   said, "Get the hell out of my office" (indicating).  I

15   may have.  I don't remember, but --

16        Q.  Did you make a fist?

17        A.  No, no.

18        Q.  Did Ms. Bishop submit a complaint about this?

19        A.  Yes.

20        Q.  And who did she submit a complaint to?

21        A.  I believe it was one of the ASACHs.  Could have

22   been ASACH ████████ ████████ or it could have been

23   ████████

24        Q.  And what happened?

25        A.  ASACH ████████ asked me to come to his office

Bradford Devlin
July 08, 2019

1    and asked me to explain what had happened.  So I told

2    him.  And while I was explaining, the other ASACH, ▓▓▓

3    ▓▓▓▓ came in, and they both listened to my explanation

4    as to what happened.  And they did -- they said "okay."

5    I remember ▓▓▓▓▓▓▓ said, "I would have told her the

6    same thing myself."

7         Q.  So you felt supported by your ASACHs?

8         A.  Yes, I did.

9         Q.  Was this -- would this be 2009 --

10        A.  Could be.

11        Q.  -- approximately?

12        A.  Could be, yes.

13        Q.  Okay.

14        A.  I would guess 2008 or '09.

15        Q.  So what's the deal with the e-mails?  You used

16   to circulate jokes to your team; is that right?

17        A.  Yes.

18        Q.  Okay.  And during the course of the past couple

19   years, did you have an opportunity to look at those

20   e-mails?

21        A.  Yes.

22        Q.  What do you think?  Poor judgment circulating

23   the e-mails or would you do it again?

24        A.  After this experience, I would not do it again.

25        Q.  And why is that?

Bradford Devlin
July 08, 2019

1      A.   Because I know that some people may feel

2   offended by those.

3      Q.   Could you see where some of the e-mails would

4   have a racial tinge to them?

5      A.   I -- I have a hard time seeing that.  To me,

6   they were -- they were humorous, but I can -- I can

7   understand how someone might be offended by it.

8      Q.   How long did you continue the practice of

9   sending e-mails like that to your group?

10     A.   Oh, I did that for most of the time I was a

11  supervisor of the group.  I did it often.  If I found

12  something that came across, a joke or something that was

13  forwarded to me that I -- that I found was humorous,

14  I -- I forwarded the humor on.

15     Q.   And so that continued until when?

16     A.   Oh, it could have continued until -- until I

17  left that group, 2011.

18     Q.   And why did you stop at that point?  Or did you

19  continue, just with your new group?

20     A.   Sometimes I will still forward humorous stuff.

21  I'll continue to forward humorous stuff today.

22     Q.   And what collection of people do you send that

23  to?

24     A.   My group, people -- people outside of my group,

25  friends and acquaintances that I -- that I have, just

Bradford Devlin
July 08, 2019

1    from work.

2         Q.  Okay.  And that comes through on the ATF

3    e-mail --

4         A.  Yes.

5         Q.  -- right?

6         A.  Yes.

7         Q.  Okay.  Has anybody ever told you not to do

8    this?

9         A.  No.

10        Q.  Has anybody ever asked you for copies of the

11   e-mails that you send?

12        A.  Yes.

13        Q.  Who?

14        A.  The ATF counsel, the attorney of ATF counsel.

15        Q.  When was this?

16        A.  It could have been within the last year or

17   less.

18             MS. CHAN:  And I'm going to object for the

19   record to the extent that this calls for any content

20   about those e-mails or any communications with counsel

21   based on attorney/client privilege.

22             MR. WING:  Okay.  I'm going to ask some

23   clarifying questions.  I'll give you time to object.

24   BY MR. WING:

25        Q.  Was it your understanding that this was -- that

Bradford Devlin
July 08, 2019

1   this request to you was related to Cheryl Bishop's

2   lawsuit?

3        A.   Yes.

4        Q.   Okay.  Were you ever asked for such e-mails for

5   the purpose of -- as you understood it, supplying

6   documents that were responsive to Ms. Bishop's lawyers'

7   requests?  In other words, was it your understanding

8   that we were requesting these e-mails?

9        A.   Yes.  The -- yes.  The most recent one was my

10  understanding -- I'm sorry.  It was my understanding

11  that ATF litigation counsel had asked for them.  I

12  don't -- it was not my understanding that -- that you or

13  anybody representing Cheryl Bishop had asked for them.

14       Q.   Okay.  How did you go about searching those

15  e-mails?

16       A.   I was sent instructions on -- excuse me.  I was

17  sent instructions on how to search.  And I also -- I

18  also provided the serial -- make, model, and serial

19  numbers of the laptop that I have had, and any cell

20  phones, government-issued cell phones to them.

21       Q.   The make, model, and serial numbers?

22  That's -- or did you give them the cell phone itself?

23       A.   Actually, I -- no, I didn't give them the cell

24  phone.  But they asked for the serial number and the pin

25  number, I believe, of -- of -- I'm sorry -- of the

Bradford Devlin
July 08, 2019

1    laptop and the cell phones.  And they also asked for a

2    snapshot of my iTunes, iCloud.

3        Q.  Okay.  How often do you synch up your phone

4    with iTunes?

5        A.  I don't use iTunes.  I --

6        Q.  So you've never synched your phone?

7        A.  I don't know.  I'm not -- my kids help me with

8    my phone.  I -- if I -- if I synch my phone, it

9    was -- it was through help through the -- through the

10   help desk because my phone stopped working or something.

11       Q.  Okay.  So did you check your cell phone for

12   text messages?

13       A.  Yeah.  Yes.

14       Q.  And did you find any?

15       A.  No.

16       Q.  How -- what did you -- how did you go about

17   searching your phone?

18       A.  I -- I searched all my text messages that I

19   have.

20       Q.  Do you generally delete your text messages or

21   do they just accumulate?

22       A.  I have deleted some in the past, but they

23   usually just accumulate.

24       Q.  And when you -- you didn't just, like,

25   physically go through and read all of your text

Bradford Devlin
July 08, 2019

1    messages, did you?

2        A.  No.  I looked for --

3        Q.  You searched by a term?

4        A.  Yeah.

5        Q.  What did you search?

6        A.  Cheryl Bishop.

7        Q.  Anything else?

8        A.  No.  I searched e-mails like that, too.

9        Q.  So only texts that has her full name would show

10   up?

11       A.  I don't know if it was her -- if it would have

12   shown up her full name or her just -- or her first or

13   last name.  I don't -- I don't know.  I don't know

14   how it would come up.

15       Q.  And you found no texts that had Cheryl or

16   Bishop or Cheryl Bishop?

17       A.  Correct.

18       Q.  And how far back does your phone go?

19       A.  I don't know.

20       Q.  When is the last time you got a new phone?

21       A.  Probably a year ago, I think, or less, maybe.

22   Maybe -- maybe less.

23       Q.  And before you got that new phone, did you get

24   help preserving whatever was on your phone somewhere and

25   then have it put on your new phone?

Bradford Devlin
July 08, 2019

1       A.  There were instructions on when we get a new

2   phone on how we carry over all of the -- the apps, I

3   guess, and the -- and the phone numbers.  That's --

4   that's all I'm aware of.

5       Q.  So you think that you've lost all of your

6   texts?

7           MS. CHAN:  Object to --

8   BY MR. WING:

9       Q.  -- from before this past year?

10          MS. CHAN:  Object to the form of the question.

11  Foundation, speculation.  Answer if you know.

12          THE WITNESS:  Repeat the question, please.

13  BY MR. WING:

14      Q.  Do you believe that you've lost all the texts

15  that you sent or received before this past year?

16          MS. CHAN:  Object to the form of the question.

17  Foundation, speculation.  Answer if you know.

18          THE WITNESS:  I have no idea.  I -- if -- they

19  could be there.  I --

20  BY MR. WING:

21      Q.  Do you have your phone with you?

22      A.  Yeah.

23          MS. CHAN:  We would object to you looking right

24  now.

25          MR. WING:  I'm not going to look.  I'm going to

Bradford Devlin
July 08, 2019

1   ask him.

2          MS. CHAN:  I think there's a separate request

3   for production or whatever that you sent out.  We'll

4   refer to that request for any review of any texts that

5   you have.  That's not part of this particular deposition

6   request.  So if you have questions to ask him, he can

7   answer.

8   BY MR. WING:

9      Q.  Well, I'm going to ask you to look at your

10  phone and see if you have texts that go beyond the past

11  year.

12         MR. WING:  Are you instructing him not to do

13  that?

14         MS. CHAN:  I'm instructing -- well, you already

15  have -- this is for his -- any questions that you have,

16  but not specific to the phone that he has.  The phone is

17  government property.  So you already have a request for

18  production put out with respect to the phone and

19  laptops, right?  And so that's something that we'll

20  respond to separately.

21         MR. WING:  I don't see what the objection is.

22  I'm asking him to look at his phone --

23         MS. CHAN:  Uh-huh.

24         MR. WING:  -- and I don't think that there's a

25  legitimate objection to prevent him from looking at his

Bradford Devlin
July 08, 2019

1    phone and telling me that information.

2         MS. CHAN:  Okay.  Well, why don't we table that

3    for a break and if you have continuing questions on it,

4    and I'll follow up and see if we can work something out.

5    Okay?

6         MR. WING:  Okay.

7         MS. CHAN:  But for now I'm directing him not to

8    do that.  Because I just want to make sure that we give

9    accurate responses to you, you know, for some -- you

10   know, iPhones can be kind of an opaque thing, especially

11   if they're, you know, the government phones that we

12   don't -- we're not -- you and I lay people are not, you

13   know, custodians of, if that makes sense.

14        MR. WING:  I agree with you.  I don't think

15   there's been any response to what you're doing in

16   response to that request other than, "We object."  So --

17        MS. CHAN:  Right.  And there's a specific -- I

18   believe a specific RFP out that you sent to that.

19        MR. WING:  Uh-huh.

20        MS. CHAN:  So I just want to make sure that the

21   right people are addressing the right tech, right?  And

22   if --

23        MR. WING:  Uh-huh.

24        MS. CHAN:  -- we're just doing it here sort of

25   ad hoc, I just don't -- I want to make sure that our

Bradford Devlin
July 08, 2019

1   responses are accurate.  So I'll follow up if we take a

2   break later and then -- to see if that's still our

3   position.  Okay?

4          MR. WING:  Okay.

5   BY MR. WING:

6      Q.  Okay.  At some point in time -- where were you

7   when Cheryl Bishop became a canine handler?  Where were

8   you located?

9      A.  I don't know.  Do you remember what year it was

10  she became a canine handler?

11     Q.  So it -- maybe 2015.  So you might have been in

12  Eugene?

13     A.  I would have been in Eugene.

14     Q.  Okay.

15     A.  Summer of 2015, I got to Eugene.

16     Q.  It's got to be before that.  Okay.

17          Anyway, you knew that she was a canine handler

18  at some point, right?

19     A.  Yes.

20     Q.  Did you ever work a scene with her when she was

21  a canine handler?

22     A.  I probably did, yes.

23     Q.  Okay.  Did you ever develop any opinions about

24  her skills or abilities as a canine handler?

25     A.  No.  I thought she did fine as a canine

Bradford Devlin
July 08, 2019

1    handler.

2         Q.   Okay.  And at some point, did you learn that

3    she had applied for a detail in Washington, D.C.?

4         A.   I did hear that she was considering a detail in

5    Washington, D.C. --

6         Q.   Who told --

7         A.   -- a one-year detail.

8         Q.   Who told you that?

9         A.   I -- I don't know who told me that.

10        Q.   Do you know other canine handlers?

11        A.   I know of a past canine handler.

12        Q.   Who is that?

13        A.   ██████████████████

14        Q.   And where is ██████████ located?

15        A.   He has recently been transferred to the tracing

16   center, and I believe it's Martinsburg, Virginia or West

17   Virginia.

18        Q.   I think it's West Virginia.

19        A.   West Virginia.

20        Q.   And where was he before that?

21        A.   Portland.

22        Q.   Okay.  And what did he do in Portland?

23        A.   He was the supervisor.

24        Q.   So that would be a RAC, R-A-C?

25        A.   Yes.

Bradford Devlin
July 08, 2019

1    Q.  Okay.  So while you were a RAC in Eugene, he

2    was a RAC in Portland?

3    A.  Yes.

4    Q.  Okay.  And is that where ███████████ also

5    was a RAC?

6    A.  She was.

7    Q.  She was?

8    A.  Yes.

9    Q.  Okay.  She's not there anymore?

10   A.  Correct.  She's retired.

11   Q.  Do you know where she's retired to?

12   A.  I believe she lives in the Vancouver area;

13   Vancouver, Washington, I believe.

14   Q.  So were they RACs there at the same time or is

15   there only one RAC in Portland?

16   A.  There was two there at one time.  So when I

17   went to Portland in 2011, there were two groups.

18   ████████ was the supervisor of one, which was the arson

19   and explosive group, and I was the supervisor of the

20   other one.  It was just a gun group.

21   Q.  Okay.  So do you think that ███████ told you

22   that -- well, strike that first.

23        He had been a canine handler?

24   A.  Yes, but I believe he was a canine handler in

25   California.

Bradford Devlin
July 08, 2019

1    Q.   Okay.  And do you believe he's the one who told

2    you that Cheryl Bishop had applied for a TDY in

3    Washington, D.C.?

4    A.   No, I don't -- I never discussed that with ▇▇▇

5    ▇▇▇, that I can remember.

6    Q.   Who do you remember discussing it with?

7    A.   Probably someone in Seattle.

8    Q.   ▇▇▇▇▇▇▇▇▇▇?

9    A.   I don't -- I don't remember.

10   Q.   You know ▇▇▇▇?

11   A.   Yes, I know ▇▇▇▇.  Yes, I know ▇▇▇▇.

12   Q.   You knew that he was a canine handler, right?

13   A.   Yes.  Yes, he was.

14   Q.   And he had become an ASACH; is that right?

15   A.   No.  He's not an ASACH.  He's a -- he's in

16   Mexico somewhere as a -- I don't know what his title is,

17   but he's -- he's not an ASACH.

18   Q.   Okay.  How did you know he's in Mexico?

19   A.   I talked to him before he left, before he

20   moved.

21   Q.   Where was he before he moved?

22   A.   Seattle.

23   Q.   Okay.  And what was his job in Seattle before

24   he moved?

25   A.   He was the supervisor of the arson explosive

Bradford Devlin
July 08, 2019

1  group in Seattle.

2      Q.  Okay.  Did you ever have discussions with

3  him -- strike that.

4          Do you know what his opinion of Cheryl Bishop

5  is?

6      A.  I don't.

7      Q.  So who else in the Seattle office might have

8  told you that Cheryl Bishop was applying for a TDY in

9  D.C.?

10      A.  I'm trying to think.

11          MS. CHAN:  Objection, asked and answered.

12  Answer if you know.

13          THE WITNESS:  That was several years ago.  I

14  can't remember specifically who I heard that from.  If

15  it comes to me, I'll tell you.

16  BY MR. WING:

17      Q.  Okay.

18      A.  But right now I don't -- I couldn't tell you

19  who it was.

20      Q.  Have you remembered who the other AUSA is?

21  We've got ██████ --

22      A.  ██████

23      Q.  ██████

24      A.  My gosh, I'm sorry.  I can't --

25      Q.  All right.

Bradford Devlin
July 08, 2019

1      A.   I know him.   I can see his face.   I have talked

2   to him many times.   But right now his name is escaping

3   me.   I apologize, but --

4      Q.   It's okay.   Tall?   Short?   You said he's an

5   older man.

6      A.   Uh-huh.   He's probably 60, 65.   He's getting

7   ready to retire.

8      Q.   Clean shaven?

9      A.   Yeah.

10      Q.   Wears glasses?

11      A.   Huh-uh.   No.

12      Q.   Thin?

13      A.   Average build.

14      Q.   Large?

15           Okay.   So you found out that Cheryl was

16   applying for this TDY.   What, if anything, did you do in

17   response to that information?

18      A.   Nothing.

19      Q.   Were you surprised?

20      A.   No.

21      Q.   It made sense, right?   Same kind of thing that

22   you had been encouraged to do, right?

23      A.   Yes.

24           MS. CHAN:   Object to the form.   Answer if you

25   know.

Bradford Devlin
July 08, 2019

1   BY MR. WING:

2        Q.   It's a way to move up within the ATF, right?

3        A.   Yes.

4        Q.   Okay.  Did you learn what type of job she was

5   going to get?

6        A.   No.  I -- no.  I had heard that she was looking

7   at a one-year temporary duty assignment in headquarters.

8   I wasn't for sure which -- where she was going or what

9   position she was going to get.  I don't know.

10       Q.   Okay.  And this didn't really mean much to you;

11  is that right?

12       A.   Correct.

13       Q.   Okay.  At some point later, did it mean

14  something to you?

15       A.   No.

16       Q.   Did you complain to the management in the

17  Seattle field office that your own transfer had been

18  scuttled and you were bothered that Cheryl Bishop might

19  get a TDY in D.C.?

20       A.   Yes, that I believe.  Yes, I believe I did say

21  that.

22       Q.   Okay.  And how long after you learned about her

23  TDY did you have that conversation?

24       A.   I don't remember how long after it was.

25       Q.   Weeks?

Bradford Devlin
July 08, 2019

1        A.   Probably.  Probably pretty -- probably --

2   probably very quickly after I heard about it.

3        Q.   Because when I asked you what, if anything, did

4   you do, you said nothing.  It didn't really mean much to

5   you.  Now it means a lot.

6        A.   Yes.

7        Q.   So which is it?

8        A.   Well, it's not that it means a lot.  It was --

9   I was frustrated because I had been expelled from

10  Washington, D.C., for my job.  And then I -- then I

11  heard that Cheryl Bishop was getting a TDY, which was

12  a -- you're paid per diem for one whole year.

13           So I was frustrated because I -- because I lost

14  my -- my potential for -- for a promotion and an

15  increase in pay, because the COLA is much higher in

16  Washington, D.C., so -- so I was expelled, and she was

17  offered a position.  And I -- and I remember mentioning

18  that to my supervisor.

19       Q.   Who was that?

20       A.   That was ▓▓▓▓▓▓

21       Q.   Okay.  What did you do?  How did you mention it

22  to ▓▓▓  Did you call ▓▓▓ up?

23       A.   I either called ▓▓▓ or I saw ▓▓▓ in person.  I

24  don't remember.

25       Q.   How often did ▓▓▓ come down to Eugene?

Bradford Devlin
July 08, 2019

1     A.   Once or twice, maybe. ███ came to Portland

2   once or twice when I was a supervisor there.

3     Q.   Okay.

4     A.   And I believe --

5     Q.   I'm sorry.  Go ahead.

6     A.   And then I believe███ came to Eugene once,

7   too.

8     Q.   During the time that ███ was an ASACH, ███ came

9   down once?

10    A.   ███ came to Portland more than once.

11    Q.   Okay.

12    A.   I remember███ coming to Eugene one time.

13    Q.   Okay.  Was that for the Rose --

14        MS. CHAN:  Roseburg.

15  BY MR. WING:

16    Q.   -- Roseburg --

17    A.   Shooting?

18    Q.   -- shooting?

19    A.   ███ didn't stop in Eugene there.  I believe she

20  stayed in Roseburg.

21    Q.   Okay.

22    A.   But, yeah, ███ was there.  ███ was in Roseburg

23  for that -- that college shooting.

24    Q.   So you either had to be in Portland or the one

25  time that███ was in Eugene to have this conversation or

Bradford Devlin
July 08, 2019

1    else you had to do it by phone?

2         A.   Correct.

3         Q.   Okay.  And was anybody else with you when you

4    spoke with█████

5         A.   Probably not, no.

6         Q.   So you don't think'█████████ was part of

7    this?

8         A.   No.

9         Q.   It was just you and █████████

10        A.   Yes.

11        Q.   Okay.  And what did you tell █████

12        A.   I told █████ that I was -- I remember expressing

13   that I was pretty frustrated that -- that Cheryl got a

14   position after I was expelled, and I thought that was --

15   that was kind of unfair.

16        Q.   Now, is your language a little tame because

17   you're in a deposition right now?  I mean, would you

18   have expressed this much more forcefully?

19        A.   Yeah.

20             MS. CHAN:   Object to the form.  Answer if you

21   know.

22   BY MR. WING:

23        Q.   Yes?

24        A.   Yes, I would have.

25        Q.   Okay.  Did you feel that Cheryl Bishop was to

Bradford Devlin
July 08, 2019

1   blame for you getting expelled from Washington, D.C.?

2        A.   No.

3        Q.   Who do you blame for that?

4        A.   The upper management that actually expelled me.

5        Q.   And what is your understanding of the reason

6   why they expelled you?

7        A.   Because of my comment referring

8   Cheryl -- referring to Cheryl Bishop as a train wreck,

9   and the -- and the cartoons sent via e-mail.

10       Q.   But you don't blame Cheryl Bishop for

11   complaining about those things?

12       A.   No, I don't blame her for complaining.

13       Q.   Why were you upset that she was getting the

14   TDY?  Why is that relevant at all to you getting

15   expelled?

16            MS. CHAN:  Object to the form.  Answer if you

17   know.

18            THE WITNESS:  So you're asking me why I --

19   BY MR. WING:

20       Q.   Why did you care if she got a TDY?  Why is that

21   relevant to you -- why is it unfair that she got --

22   would get to go to D.C. and you wouldn't get to go?

23            MS. CHAN:  Object to the form.  Answer if you

24   know.

25            THE WITNESS:  I thought it was unfair for

Bradford Devlin
July 08, 2019

1    myself, not for Cheryl Bishop.  I thought that I was

2    being treating unfairly, not Cheryl Bishop.

3    BY MR. WING:

4        Q.  I get -- I get that you felt you were not being

5    treated fairly, but why were you comparing how you were

6    being treated with Cheryl?

7            MS. CHAN:  Object to the form, misstates prior

8    testimony.  Answer if you know.

9            THE WITNESS:  Why would I compare --

10   BY MR. WING:

11       Q.  How she was being treated with how you were

12   being treated?

13           MS. CHAN:  Object to the form.  Answer if you

14   know.

15           THE WITNESS:  Compare how she was being treated

16   with how I was being treated -- I thought -- I thought

17   that she was -- she was being given, like, preferential

18   treatment because the EEO complaint was still in

19   process.

20   BY MR. WING:

21       Q.  You thought she was being given preferential

22   treatment because she had filed an EEO complaint?

23       A.  Yes.

24       Q.  Okay.  How did you know she had filed an EEO

25   complaint?

Bradford Devlin
July 08, 2019

1        A.   Because I was asked to give a -- a written -- I

2    believe they call it interrogatory or -- I was asked to

3    give a written statement.

4        Q.   Okay.  In the complaint that she made --

5    regarding the complaint that she made?

6        A.   Yes.

7        Q.   Okay.  So did anyone tell you that she had

8    applied for the TDY before ever filing an EEO complaint?

9        A.   I don't remember.  The time frames, I

10   don't -- I couldn't tell you what happened first,

11   second, and third.

12       Q.   Okay.  When you spoke to ███████████ and you

13   said, "I think this is really unfair," what did she say?

14       A.   I don't even remember what ███████ said.  I

15   think ████ listened to me vent, and I think

16   that's -- that was probably her purpose.  I don't think

17   ████ could really do anything.  But I don't remember

18   ████ -- I don't remember ████ comments.

19       Q.   Now, you had had a phone call with ████ and ████

20   ████████ in which they told you that they had no choice

21   but to refer Cheryl Bishop's complaint about you to IAD;

22   is that correct?

23       A.   Yes.

24       Q.   And did you say to them, "Why didn't you give

25   me a heads-up before that?"

Bradford Devlin
July 08, 2019

1        A.   Yes.

2        Q.   And what did they tell you?

3        A.   They said they couldn't.

4        Q.   Did that surprise you?

5        A.   Yes.

6        Q.   Why did it surprise you?

7        A.   It didn't make any sense to me.  I thought that

8   they should have probably called me and at least learned

9   of the situation about what happened before they

10  forwarded it.

11       Q.   Okay.

12       A.   I thought there -- I thought there should have

13  been a little bit of inquiry -- inquiry on their part

14  first.

15       Q.   Did you tell them what happened?

16       A.   Yes.

17       Q.   Did you tell them that you had -- in that

18  conversation, did you tell them that you had called

19  Cheryl Bishop a train wreck to U.S. Attorneys?

20       A.   Yes.

21       Q.   Did you -- what was their reaction to that?

22       A.   I don't think they had much of a reaction.

23       Q.   Did you get the impression they thought it was

24  no big deal?

25       A.   No, I didn't get that impression at all.

Bradford Devlin
July 08, 2019

1      Q.   What kind of impression did you get?

2      A.   I got the impression that it was a big deal

3  because they had -- they had talked with ATF counsel and

4  it ultimately got referred to Internal Affairs.  So that

5  was my sign it was a big deal.

6      Q.   Have you come to recognize that it was not

7  something you should have done or do you sort of shrug

8  it off like, Okay, it's just a difference of opinion?

9           MS. CHAN:  Object to the form.  Answer if you

10  know.

11          THE WITNESS:  I don't shrug it off.

12          What was your question?

13  BY MR. WING:

14     Q.   Do you think it was fine?

15     A.   Do I think it was fine as to what I --

16          MS. CHAN:  Object -- go ahead.  Object to the

17  form.

18  BY MR. WING:

19     Q.   Do you think it was fine for you to tell AUSAs

20  that Cheryl Bishop was a train wreck?

21          MS. CHAN:  Object to the form.  Answer if you

22  know.

23          THE WITNESS:  Yes, I do.

24  BY MR. WING:

25     Q.   Have you ever told anyone that you thought

Bradford Devlin
July 08, 2019

```
1    she's worthless?

2         A.   Yes, I probably did.

3         Q.   Who do you think you told that to?

4         A.   Probably maybe some peers that I work with.

5         Q.   Like who?

6         A.   I don't know.

7         Q.   ████████████

8         A.   It's possible.

9         Q.   What about ████████████

10        A.   That's possible, too.

11        Q.   You were a fairly tight with those two; is that

12   right?

13        A.   Yes.  I still am.

14        Q.   And who else would you say you're tight with?

15        A.   Everybody in my group in Eugene.  Nearly

16   everyone in Portland.  There's several agents in Seattle

17   that I'm -- I'm friends with.  I've worked with them for

18   many years.

19        Q.   Would you say that all those people know how

20   you feel about Cheryl Bishop?

21             MS. CHAN:  Object to the form.  Foundation.

22   Answer if you know.

23             THE WITNESS:  Yes.

24             MR. WING:  Okay.

25             MS. CHAN:  Can we take a quick --
```

Bradford Devlin
July 08, 2019

1         MR. WING:  Yeah, sure.

2         MS. CHAN:  -- five-, ten-minute break?  Okay.

3         THE VIDEOGRAPHER:  Off the record at 11:12.

4         (Recess)

5         THE VIDEOGRAPHER:  Back on the record at 11:32.

6    BY MR. WING:

7         Q.  Mr. Devlin, after -- strike that.

8         Was it your understanding that IAD declined any

9    action toward you and referred the matter of Cheryl

10   Bishop's complaint back to management?

11        A.  Yes.

12        Q.  And did you then have a conversation with

13   ▓▓▓▓▓▓▓▓ on the phone, and what did ▓▓ tell you in

14   that call?

15        A.  Yes.  ▓▓ told me that ▓▓ expected that the

16   Internal Affairs Division was going to refer it back

17   to -- to division management.  And ▓▓ said if that

18   happened, that ▓▓ would be giving me a -- a notice of

19   caution.

20        Q.  What is the significance of a notice of

21   caution, if anything?

22        A.  I think it's a record.  It creates a record

23   of -- of a conversation or corrective actions or

24   recommendations.

25        Q.  Recommendations to you?

Bradford Devlin
July 08, 2019

1        A.  Yes.

2        Q.  So you could choose to follow them or not?

3        A.  I have the option of -- of doing as my

4    supervisor says or not, yes.

5        Q.  Okay.  It's not discipline, correct?

6        A.  I don't believe it's discipline.

7        Q.  Okay.  So did you take it seriously?

8        A.  Yes.

9        Q.  In what way?  What did you do differently after

10   getting this letter of caution or notice of caution?

11       A.  I've had -- I've had no more -- no more contact

12   with Cheryl other than professional work-related only.

13   And I won't -- I won't discuss my opinions of -- of

14   anybody else's work ethic or their competence or lack of

15   competence with -- with anybody else other than my

16   supervisor.

17       Q.  You did, in fact, though, tell ▬▬▬▬▬  I

18   think -- no?

19       A.  ▬▬▬?

20       Q.  ▬▬▬.  Excuse me.

21       A.  ▬▬▬.

22       Q.  You did have a conversation after you got that

23   letter of caution, with ▬▬▬▬ where he asked you how

24   the EEO was going and you explained the history of it

25   and what you had said about Cheryl, right?

Bradford Devlin
July 08, 2019

```
1          MS. CHAN:  Object to the form of the question.

2    Answer if you know.

3          THE WITNESS:  He had asked me -- ▬▬▬▬▬

4    asked me during a RAC conversation in Seattle, he had

5    asked me -- he said, "Hey, I heard about this.  What

6    happened?"

7          And I told him, "Well, it's a long story."

8          And he said, "Well, I got time."  So I did give

9    him a brief synopsis at to what had happened, maybe a

10   two-minute synopsis, one-minute synopsis.  So I did tell

11   him, yes.

12   BY MR. WING:

13       Q.  Including telling him that you had disparaged

14   Cheryl Bishop to the AUSAs?

15       A.  I had told him what I referred to, yes.

16       Q.  Did you not recognize that in passing along

17   your opinion as part of telling this story, you were

18   continuing to disparage her?

19          MS. CHAN:  Object to the form, argumentative.

20   Answer if you know.

21          THE WITNESS:  No.

22   BY MR. WING:

23       Q.  You thought it was fine?

24       A.  Sure.

25       Q.  Have you told anybody else?
```

Bradford Devlin
July 08, 2019

1          MS. CHAN:  Object to the form, vague.  Answer

2     if you know.

3          THE WITNESS:  Yes.

4     BY MR. WING:

5          Q.  Who else?

6          A.  I've mentioned it to some of my closest friends

7     in ATF.

8          Q.  Who?

9          A.  ████████, ████████ and I mentioned it to

10    ████████.  Other agents have actually come to me and

11    asked me, "What's" -- "what's the deal?" or, "What's" --

12    "what's going on with this?"

13         And to several of them I'd say, "It's still

14    a" -- "it's still under some litigation, so, sorry."

15         Q.  So you've not told them?

16         A.  No.  I have told those people.  I just --

17         Q.  But did you tell them what you had said about

18    Cheryl?

19         A.  Yes.  I told ████ -- I'm sorry.  ████████

20    and ████████

21         Q.  Where is ████ located?

22         A.  ████████████████

23         Q.  He's an ATF agent there?

24         A.  Yes.

25         Q.  And have you told anybody else besides

Bradford Devlin
July 08, 2019

```
1    ███████████, ████████  and ██████████

2         A.   ██████?

3              MS. CHAN:   ██████.

4    BY MR. WING:

5         Q.   I'm sorry.  Mr. ██████.

6         A.   ██████, yes.  That's it, yeah.

7         Q.   And this is after you got --

8         A.   And my wife.

9         Q.   Okay.  She doesn't work for the ATF?

10        A.   No.

11        Q.   Okay.  And this is after you got the letter of

12   caution, right?

13        A.   It may have been before.

14        Q.   Well, the conversation with ██████████ was

15   certainly after, right?

16        A.   Sure, but I don't -- it could have been before

17   or after as far as ██████████ and ██████████ are

18   concerned.

19        Q.   Okay.  Cheryl Bishop had exchanged e-mails from

20   you -- exchanged e-mails with you where she said, "I

21   heard you've been disparaging me."

22             Do you remember those exchange of e-mails?

23        A.   Yes.

24        Q.   And you wrote to her, "I don't know what you're

25   talking about."
```

Bradford Devlin
July 08, 2019

1          Do you remember writing that?

2      A.  Yes.

3      Q.  That wasn't true, was it?

4      A.  I wasn't for sure.  I was trying to get

5  information out of her as well.  I had a good idea what

6  she was talking about, but I didn't know the depth of

7  what she -- I was fishing for her -- I was fishing for

8  information from her.

9      Q.  So it wasn't true, but you were --

10     A.  Well, it was partially true.  I did have an

11  idea what she was talking about.

12     Q.  And then after she wrote back to you and said,

13  you know, "Please don't do this," right?

14     A.  (Nods head.)

15     Q.  Is that right?

16     A.  Yes.

17     Q.  You forwarded her exchanges -- your exchanges

18  with her to your friends, ████████ and ████████

19  right?

20     A.  I believe I did.

21     Q.  And you wrote, "This is entertaining" or words

22  to that effect?

23     A.  I probably did.  I don't remember what I wrote,

24  but I -- I probably did.

25     Q.  Well, why would you say it was entertaining?

Bradford Devlin
July 08, 2019

1     A.  I don't know.  I thought I was probably -- I

2  probably was a little surprised at the -- at her -- at

3  her e-mail.  I felt that it wasn't true, entirely true.

4  I know it wasn't entirely true, some of the claims that

5  she has on that e-mail.  That was probably the

6  entertaining part I was referring to.

7     Q.  What was entertaining about it?

8     A.  About how she said that she was -- she had done

9  the first RICO case in Washington, her Title III case.

10  That was entertaining to me.

11     Q.  So you didn't think what she said was true?

12     A.  Correct.

13     Q.  And so you thought it was funny?

14     A.  Yes.

15     Q.  Okay.  I'm going to show you what has been

16  marked as Exhibit 44 previously and just ask you to

17  please confirm that it is a statement of yours.  The

18  name is blocked out, and so is the signature line.

19  Please take a look at it as needed (indicating).

20     A.  Yes.

21     MS. CHAN:  And is that the same -- sorry.  Is

22  that the same set of exhibits that you had e-mailed me?

23     MR. WING:  Yes.

24     MS. CHAN:  Okay.  Because you said that was for

25  �—�—�—�—�— .  But it's for this as well, right?

Bradford Devlin
July 08, 2019

1        MR. WING:  Yeah.

2        MS. CHAN:  Okay.

3   BY MR. WING:

4        Q.  Is that your declaration?

5        A.  Yes.

6        Q.  And did you swear that under penalty of

7   perjury?

8        A.  I don't know.

9        Q.  Is it --

10       A.  This is -- no.  This is just one that I wrote

11   and submitted for -- for my Equal Employment Opportunity

12   complaint.

13       Q.  Right.

14       A.  Yes.

15       Q.  And even though it's got the name blacked out

16   and the signature blacked out, that is your statement?

17       A.  Yes.

18       Q.  Okay.  Was everything true --

19       A.  Yes.

20       Q.  -- in that statement?

21       A.  Yes.

22       Q.  Okay.  I'm going to ask you to please sign it

23   and date it today, at the very end (indicating).

24       A.  Today is the 8th?  9th.

25       Q.  Yes.

Bradford Devlin
July 08, 2019

1           MS. CHAN:  8th.

2    BY MR. WING:

3           Q.  July 8th of 2019.

4           A.  (Complies.)

5           Q.  Okay.  Thank you.

6           Do you have any idea what the Hatch Act is?

7           A.  I'm not real familiar with it, but probably not

8    as familiar as you are with it, sir.

9           Q.  Do you have any idea what it means?

10          A.  Yeah.  It's -- it's -- has to do with people

11   running for office, and us not supporting

12   or -- supporting or not supporting them, I believe.

13          Q.  Did anyone at ATF say, "You should be more

14   careful with e-mail jokes you send around.  When you

15   send around e-mails that criticize the president, that

16   might run afoul of the Hatch Act"?

17          A.  No.

18          Q.  This is the first you're hearing of that?

19          A.  Yes.  Well, not the first time of hearing of

20   the Hatch Act.

21          Q.  But of that potential criticism of something

22   you've done?

23          A.  Nobody has spoken with me about it, if that's

24   what you're asking.

25          Q.  Okay.  Do you, in the course of your ATF

Bradford Devlin
July 08, 2019

1   activities, text with other agents?

2        A.  Yes.

3        Q.  That's kind of a daily thing, right?

4        A.  Uh-huh.

5        Q.  It's one of the methods of communicating?

6        A.  Yes.

7        Q.  Okay.  When you had that first call with ▆▆▆

8   ▆▆▆ and ▆▆▆▆▆▆ where you were told they had sent

9   off Cheryl's complaint to IAD, did either one of them

10  instruct you to have no more contact with her?

11       A.  I believe they did.

12       Q.  At that point?

13       A.  I don't remember it was at that point or if it

14  was at the point after I spoke with ▆▆▆▆▆ at the RAC

15  conference.  It could have been either one.

16       Q.  How did they find out about that?

17       A.  I don't know.  I -- somebody, I assumed it was

18  Cheryl, went and talked to somebody in division and let

19  them know that I was -- that I spoke with ▆▆▆▆▆

20  about -- about -- about what I had said.  And I was

21  notified by my supervisor after that, that division -- I

22  worked division -- Seattle Field Division had contacted

23  counsel, ATF counsel, and had told ATF division to tell

24  Brad Devlin not to discuss it anymore.

25       Q.  Who was your supervisor at that time?

Bradford Devlin
July 08, 2019

1        A.   ████████.

2        Q.   Okay.  Were you interviewed by ████████?

3        A.   No.

4        Q.   Didn't ████████ tell you that ATF would pay

5   for the removal of your tattoo?

6        A.   He said they thought they would.

7        Q.   And then what happened?

8        A.   Nothing.  He -- he -- that was a conversation

9   that he had told me that he had had, I believe with

10  Cheryl Bishop.  So it wasn't a -- I never -- I didn't go

11  to -- I didn't go to ████████ -- I don't remember

12  going to ████████ and asking him specifically if

13  ATF would pay for it.  I remember going to ████████

14  and asking ████ that.

15       Q.   Do you recall a complaint about your tattoo by

16  Cheryl Bishop back in 2012?

17       A.   2012?

18       Q.   I think so.

19       A.   No.

20       Q.   And do you remember -- have you ever read

21  Cheryl Bishop's complaint --

22       A.   Yes.

23       Q.   -- memo?  Okay.

24            MS. CHAN:  Are you talking about the May 3rd

25  memo?

Bradford Devlin
July 08, 2019

1        MR. WING: ' Yes, the May 3rd memo.

2        MS. CHAN:  What exhibit is that?

3    BY MR. WING:

4        Q.  Exhibit 43.  She writes, "▇▇▇▇▇▇▇ further

5    stated that he, ▇▇▇▇, later contacted the undercover

6    branch, who advised the ASACH that the policy is that if

7    a tattoo was obtained by an agent in furtherance of

8    undercover work, then they, the undercover branch, would

9    pay to have the tattoo removed.  ▇▇▇▇▇▇▇▇ said he

10   advised RAC Devlin that the undercover branch would pay

11   to have the tattoo removed."

12       MS. CHAN:  Object to the form, foundation.

13   BY MR. WING:

14       Q.  Isn't that what ▇▇▇▇▇▇▇▇ told you?

15       MS. CHAN:  Object to the form, foundation.

16   Answer if you know.

17       THE WITNESS:  I don't remember him telling me

18   that, no.

19   BY MR. WING:

20       Q.  Do you remember him telling you that he

21   contacted the undercover branch?

22       A.  No.

23       Q.  Okay.  You had put in for a job at IAD; is that

24   correct?

25       A.  Yes.

Bradford Devlin
July 08, 2019

1      Q.  And as part of that job, would you have been

2   investigating potentially complaints of discrimination

3   or harassment?

4      A.  Yes, very possible.

5      Q.  Okay.  Did you have any training in how to

6   investigate such complaints?

7      A.  No.

8      Q.  Are you familiar, though, with the policies of

9   the ATF that prohibit discrimination and harassment?

10      A.  Yes.  I have read them.

11      Q.  Okay.  Was your job that you were expecting to

12   get at IAD a permanent position?

13      A.  Yes.  It was considered a permanent position,

14   but I was going to use it as a stepping stone to go

15   somewhere else.

16      Q.  Okay.  And where were you planning to go?

17      A.  The Shooting Review Team.

18      Q.  And where is that located?

19      A.  Well, it's -- the office is in Washington,

20   D.C., but they have shooting review agents that -- that

21   live throughout the United States.  They -- they cover

22   geographical regions.

23      Q.  And is it true that you were planning to retire

24   at the end of this year?

25      A.  Yes.

Bradford Devlin
July 08, 2019

1      Q.  And move to Idaho?

2      A.  Yes.

3      Q.  Is that where _____ is located --

4      A.  Yes.

5      Q.  -- in Idaho?

6      A.  _____ yes.

7      Q.  Okay.  Have you ever -- well, strike that.

8          At one point in time, you knew that

9      _____ son had a drug problem, right?

10     A.  Yes.

11         MS. CHAN:  Object to the form.

12  BY MR. WING:

13     Q.  And --

14         MS. CHAN:  Answer if you know.  Wait until I

15  finish my objection before you answer.

16  BY MR. WING:

17     Q.  And _____ supplied you with information

18  about his son's drug dealer to investigate; is that

19  correct?

20     A.  Yes.

21     Q.  And you did investigate?

22     A.  Yes.

23     Q.  In fact, you arrested the drug dealer, right?

24     A.  Yes.

25     Q.  Okay.  The -- you worked for the ATF, not for

Bradford Devlin
July 08, 2019

1    the DEA.

2           What interest did the ATF have in his son's

3    drug dealer?

4       A.  Drugs are often many times more than not

5    associated with a violent crime.  So we -- we often tie

6    in the drugs to violent crime.  We actually have Title

7    2140 now.  At the time -- it's very common for ATF to --

8    to enforce local drug laws as well.  Even though at that

9    time we did not have Title 21 authority, we frequently

10   made drug arrests, purchased narcotics.  So it

11   was -- it's not uncommon to do that, for us.

12      Q.  Okay.  But you investigated this at the request

13   of ███████, is that right?

14          MS. CHAN:  Object to the form.  Answer if you

15   know.

16          THE WITNESS:  Yes.

17   BY MR. WING:

18      Q.  Okay.  Do you recall telling ███████ that

19   your daughter saw her on TV and was surprised at how

20   dark she is?

21          MS. CHAN:  Object to the form.  Answer if you

22   know.

23          THE WITNESS:  I -- I remember my daughter

24   saying that she saw her on TV, but not to the -- "I'm

25   surprised how dark she is."

Bradford Devlin
July 08, 2019

1    Q.  Are you saying that didn't happen or you don't

2    remember it?

3    A.  I'm saying that --

4        MS. CHAN:  Object to the form.  Answer if you

5    know.

6        THE WITNESS:  I'm not saying that didn't

7    happen.  My daughter never told me that.

8    BY MR. WING:

9    Q.  So if ▓▓▓▓▓▓▓▓▓ testified about that, she's

10   wrong?

11       MS. CHAN:  Object to the form, foundation.

12   Answer if you know.

13       THE WITNESS:  You have to ask my daughter.  My

14   daughter did not tell me that.

15   BY MR. WING:

16   Q.  Did you tell ▓▓▓▓▓▓▓▓▓ --

17   A.  No.

18   Q.  -- that your daughter said that?

19   A.  No.  I did tell her that my daughter saw her on

20   TV.

21   Q.  Did anyone actually interview you about the

22   e-mails that were attached to Cheryl Bishop's Complaint?

23   A.  No.

24   Q.  And nobody has instructed you to avoid sending

25   such e-mails again, right?

Bradford Devlin
July 08, 2019

1          MS. CHAN:  Object to the form, vague.  Answer

2     if you know.

3          THE WITNESS:  What e-mails are you -- cartoons

4     or --

5     BY MR. WING:

6        Q.  Yeah, the cartoons, making fun of Obama.

7     There's a bunch of e-mails that were attached to her

8     Complaint that you saw, right?

9        A.  Yes.

10       Q.  Okay.  And nobody has said, "Don't send those

11    kind of e-mails again," have they?

12       A.  That's correct.

13       Q.  If we were going to look at your e-mails and

14    the jokes, do you believe that we would find some jokes

15    that make fun of the ethnicity of various people?

16          MS. CHAN:  Object to the form.  Answer if you

17    know.

18          THE WITNESS:  No, you wouldn't.

19    BY MR. WING:

20       Q.  What about sexist jokes?

21       A.  You may find that.

22          MS. CHAN:  Object to the form.

23    BY MR. WING:

24       Q.  Any luck recalling the name of the other U.S.

25    Attorney, Assistant U.S. Attorney?

Bradford Devlin
July 08, 2019

1       A.   No, but I remember the name of the other ATF

2   agent.

3       Q.   And who is that?

4       A.   ███████████.

5       Q.   Would you spell it, please?

6       A.   ████████ last name is ██████████

7       Q.   Do you know where he's located?

8       A.   I believe he's in Indiana.

9       Q.   Still with the ATF?

10      A.   Yes.

11      Q.   Do you know where in Indiana?

12      A.   I don't know.

13      Q.   Did you consider that if Cheryl Bishop

14  ultimately got the RAC job in Eugene, that your comments

15  to the Assistant U.S. Attorneys and to the other agents

16  in that office about her capacity would undermine their

17  respect for her?

18          MS. CHAN:  Object to the form.  Answer if you

19  know.

20          THE WITNESS:  No, I did not consider that.

21  BY MR. WING:

22      Q.   And IAD never interviewed you about Cheryl

23  Bishop's complaint; is that correct?

24          MS. CHAN:  Object to the form, asked and

25  answered.  Answer if you know.

Bradford Devlin
July 08, 2019

1          THE WITNESS:  That's correct.

2     BY MR. WING:

3          Q.  When did you first receive a notice to preserve

4     and search for responsive texts or e-mails regarding

5     Ms. Cheryl Bishop's EEO complaint?

6          A.  Oh, I -- I don't remember.

7          Q.  Did you take steps right when you received that

8     notice?

9          A.  Yes.  What -- you asked if -- you said a

10     preserve note -- a preservation order?

11          Q.  Yeah.

12          A.  I don't --

13          Q.  You don't remember receiving that?

14          A.  I don't remember a preservation order.

15          Q.  What did you think you received?

16          A.  I received an e-mail asking for text messages

17     and e-mails, whatever I had, but I don't remember a

18     preservation order.

19          Q.  Another term for it is a litigation hold.

20              Do you think you received a litigation hold?

21          A.  I don't remember that.

22          Q.  Have you had any -- do you know who ▓▓▓▓▓

23     ▓▓▓▓▓ is?

24          A.  ▓▓▓▓▓▓▓▓ -- I believe I know ▓▓▓▓▓▓

25     ▓▓▓▓▓, an ATF agent in Missouri.

Bradford Devlin
July 08, 2019

1     Q.   Do you know who ███████████ is?

2     A.   Yes.

3     Q.   And for a time, ████████████ held the same

4  job above the SACH of the Seattle Field Division?

5     A.   Oh, I don't --

6     Q.   You don't know that ███████████?

7     A.   Not -- no.

8     Q.   Okay.  Did you ever have any contact with

9  ███████████ about your EEO matter or Cheryl

10 Bishop's EEO matter?

11    A.   Yes.  We had a -- I had a -- I don't know what

12 it was called, but after I submitted my EEO complaint

13 against ATF, they asked if I would come to -- to

14 headquarters for a -- I don't remember what they call

15 it, maybe a resolution.

16    Q.   A mediation?

17    A.   Mediation.

18    Q.   Okay.

19    A.   Yes, that was it, a mediation.  And

20 ███████████ was present for that.

21    Q.   Okay.  Did you talk with ███████████ or was he

22 just in the other room?

23    A.   No.  We sat in the same room.  I didn't have a

24 conversation with him.  It was a mediation.  There were

25 two other attorneys there and they -- they conducted the

Bradford Devlin
July 08, 2019

1    meeting.  I didn't have conversations with ▓▓▓▓▓▓▓▓.

2        Q.  Did you have contact with ▓▓▓▓▓▓▓ about

3    your own EEO matter or Ms. Bishop's other than at that

4    mediation?

5        A.  No.

6        Q.  Did you have an understanding of ▓▓▓▓▓▓▓▓

7    role in the hierarchy of ATF?

8        A.  I knew he was upper management in Washington,

9    D.C., yes.

10       Q.  Have you ever met or talked to ▓▓▓▓▓

11   ▓▓▓▓▓▓?

12       A.  Yes.

13       Q.  About what?  And I'm not looking for secrets.

14   More general.  Okay?

15       A.  It was -- I met him and spoke with him in -- in

16   Seattle.  He had made a visit to the division, and he

17   was wanting to ▓▓▓▓▓▓▓▓

18       Q.  And what did he say was the reason why he

19   wanted to ▓▓▓▓▓▓▓▓

20       A.  Because he had been involved in ▓▓▓▓

21   ▓▓▓▓▓▓

22       Q.  And when was this, approximately, ▓▓▓▓▓ make

23   this visit to Seattle?

24       A.  I would have to guess.  It would maybe be 2012,

25   maybe.

Bradford Devlin
July 08, 2019

1      Q.  And why were you part of this discussion?

2      A.  Because I was advocating for ███████ ██████ and his

3   family to stay in Oregon where they currently -- where

4   they -- where they resided at the time.

5      Q.  And Mr. ███████ wanted to move them?

6      A.  Correct.

7      Q.  What ultimately happened?

8      A.  ███████████ put in for the ███████████████

9   ███████████ got it.  He was -- he was afraid they were

10  going to relocate him.

11     Q.  And when did he take the job ███████████

12  approximately?

13     A.  Three -- three and a half years ago.  So that

14  would have been maybe 2000 -- early '16, maybe.

15     Q.  Okay.  Okay.  Do you know ███████████████?

16     A.  No.

17     Q.  ███████████?

18     A.  No.

19     Q.  ███████████?

20     A.  No.

21     Q.  ███████████?

22     A.  I recognize the name, but I -- I may have met

23  him once.

24     Q.  Okay.  ███████████?

25     A.  No.

Bradford Devlin
July 08, 2019

1       Q.  ▓▓▓▓▓▓▓▓?

2       A.  I've heard that name, too, but I don't believe

3    I've met him.

4       Q.  ▓▓▓▓▓▓▓▓

5       A.  No.

6       Q.  ▓▓▓▓▓▓▓▓?

7       A.  ▓▓▓▓▓▓▓, yes, I know ▓▓▓▓▓▓▓.

8       Q.  How do you know Deb Dassler?

9       A.  She was a canine -- she had something to do

10   with the canine branch.  She may have also been a canine

11   handler at one time.  She -- I remember her -- I think I

12   met her at the academy when I was visiting the academy.

13   And I also remember I believe that she may have been in

14   the El Paso field office after I had left.

15       Q.  When is the last time you were in touch with

16   her?

17       A.  Oh, it's been a long time.  I probably wouldn't

18   even recognize her now.  It was probably 2000 -- maybe

19   '01 or '02, maybe 2002.

20       Q.  Do you know ▓▓▓▓▓▓▓?

21       A.  ▓▓▓▓▓▓▓ no.

22       Q.  And do you have any recollection now about

23   ▓▓▓▓▓▓?

24       A.  ▓▓▓▓▓▓ -- no, I -- again, that name sounds

25   familiar.

Bradford Devlin
July 08, 2019

1          (Knocking on door)

2          MR. WING:  What time is it?

3          MS. CHAN:  It's noon.

4          MR. WING:  It's noon.  Okay.  Let me just wrap

5    up.

6    BY MR. WING:

7        Q.  Who did you tell that you received a notice of

8    caution?

9        A.  Probably ████ -- ████████ and ████████████

10       Q.  And --

11       A.  And my wife.  I may have told other people,

12   too, that I -- I can't remember who I -- who I told, if

13   I did.

14       Q.  Okay.

15       A.  It's very possible I told others.

16       Q.  And you explained why you got it, correct?

17       A.  Probably.

18       Q.  Okay.  Do you think that notice of caution was

19   unfair?

20          MS. CHAN:  Object to the form.  Answer if you

21   know.

22          THE WITNESS:  I'm a little undecided about it.

23   BY MR. WING:

24       Q.  Okay.  You have submitted two other EEO

25   affidavits for Cheryl Bishop's complaint, right?

Bradford Devlin
July 08, 2019

1      A.   Yes.

2      Q.   And those are accurate and correct?

3      A.   Yes.

4      Q.   Okay.  You stand by them?

5      A.   Absolutely.

6           MR. WING:  Okay.  I have no more questions at

7      this point.

8           MS. CHAN:  We'll need to take maybe five

9      minutes just to see if I have any follow-up.

10          MR. WING:  Oh, okay.

11          MS. CHAN:  Yeah.

12          THE VIDEOGRAPHER:  Off the record at 12:02.

13          (Recess)

14          (The deposition concluded at 12:11 p.m.)

15          (Signature reserved)

16

17

18

19

20

21

22

23

24

25

Bradford Devlin
July 08, 2019

1                   BRADFORD DEVLIN

2          I have read the transcript of my deposition
   taken on July 8, 2019, at Portland, Oregon, and make the
3  following additions or corrections:

4  PAGE  LINE  CORRECTION AND REASON FOR CORRECTION

5

6

7

8

9

10

11

12

13

14

15

16

17                   BRADFORD DEVLIN

18
   Subscribed and sworn to me before this_____
19 day of _____, 2019.

20              _____
                    Notary Public for the State
21      of _____
           residing at _____
22              My Commission Expires:_____

23
   Re:  Bishop vs. Sessions
24      United States District Court, Western District of
        Washington, No. C18-00599-TSZ
25      LH

Bradford Devlin
July 08, 2019

1                    REPORTERS CERTIFICATE

2

3          I, Melinda Hermansen, CSR No. 10-0420,

4     Certified Shorthand Reporter, do hereby certify:

5          That the foregoing proceedings were taken

6     before me at the time and place therein set forth, at

7     which time the witness was put forth under oath by me;

8          That the testimony of the witness, the

9     questions propounded, and all objections and statements

10    made at the time of the examination were recorded

11    stenographically by me and were thereafter transcribed;

12         That a review of the transcript by the deponent

13    was not requested;

14         I further certify that I am not a relative or

15    employee of any attorney of the parties, nor financially

16    interested in the action.

17         I declare under penalty of perjury under the

18    laws of Oregon that the foregoing is true and correct.

19         Dated this day 20th day of July, 2019.

20

21

22    *Melinda Hermansen*

23    _____

      Melinda Hermansen
24    CSR No. 10-0420, RPR

25

**EXHIBIT B**

ATF pays $450,000 to settle discrimination lawsuit involving a boss with a Nazi tattoo | T...   Page 1 of 6

≡                                                                    🔍 Search



Service Calls From $22

Residental Furnace Repair Replacement and Maintenance in Denver CO

SWAN Plumbing and Heating

**Local News**

## ATF pays $450,000 to settle discrimination lawsuit involving a boss with a Nazi tattoo

Nov. 16, 2019 at 7:16 pm   Updated Nov. 19, 2019 at 9:29 am



1 of 3 | Bureau of Alcohol, Tobacco, Firearms and Explosives Supervisory Special Agent Cheryl Bishop, shown with two canines.... (Courtesy of the Canine's League &... Bayless More

 By Mike Carter
Seattle Times staff reporter

A senior African American supervisor at the Seattle office of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) will receive $450,000 and get a private meeting with the agency's director to settle a lawsuit alleging the agency retaliated after she complained of racial harassment by another supervisor who has a Nazi tattoo.

In addition to the cash payout, Cheryl Bishop, a senior supervisory agent in Seattle and former bomb-dog handler, will receive a ring commemorating a previous assignment as the first female member of the ATF's Special Response Team (SRT). The ring will be presented to Bishop during a meeting with ATF Acting Director Regina Lombardo.

Bishop filed her lawsuit in 2018, alleging the agency notified her it was transferring her to work at its Washington, D.C., headquarters after she filed an Equal Employment Opportunity Commission (EEOC) complaint against fellow supervisor Bradley Devlin, the bureau's resident agent in charge in Eugene, Oregon.

103

According to court documents, Devlin has worn a Nazi-themed tattoo — showing what's described as a "German Eagle SS Lightning Bolt" — since the early 2000s. He says he got it while working undercover to infiltrate an Ohio white-supremacist biker gang called The Order of Blood. That operation led to several arrests.

Though his bosses have said they were "appalled," Devlin hasn't had the tattoo removed. The agency has said it would pay for the procedure.

Devlin could not be reached Monday and has not previously commented on the lawsuit.



**Quip for Sales**

Boost deal productivity inside Salesforce





**PayPal HERE**

With PayPal Here, you can get paid on the go.

Accept chip, swipe, or tap payments on your mobile.

Payments at the Speed of Business



**Delivery in as soon as 1 hour.**

SHIPT

SIGN UP

Devlin's tattoo, along with a series of emails sent from his ATF account mocking black people and then-President Barack Obama, were at the heart of Bishop's lawsuit. Devlin was Bishop's supervisor in Seattle from 2009 to 2011 and she alleges he has continued to disparage her work since. The Seattle Field Division of ATF oversees offices in Washington, Oregon, Idaho, Alaska, Hawaii and Guam.

Bishop's lawsuit got traction in September when U.S. District Judge Thomas Zilly summarily denied a government motion to dismiss her claims and ordered the case to trial this month.

"While I am grateful to put the lawsuit behind me, healing the emotional scars will take more time," Bishop said in a prepared statement. "What happened to me should never happen to anyone, anywhere. Since harassment, discrimination, and retaliation are alive and well, I encourage anyone who encounters them to speak out — that's the only way change happens."

April Langwell, an ATF spokeswoman in Washington, D.C., said the bureau has no additional comment on the settlement. She reiterated that employees who engage in conduct that might adversely affect the public's perception of the agency or impact its integrity or professionalism are subject to discipline, but she would not say whether Devlin was disciplined. She said he remains employed by the ATF.

Bishop joined the ATF in 1989, but left in 2003 to act as personal bodyguard for Amazon.com founder and CEO Jeff Bezos. She returned in 2009, when she was assigned to a gun-crimes task force headed by Devlin, according to court documents. She later went on to be a bomb-dog handler.

ATF pays $450,000 to settle discrimination lawsuit involving a boss with a Nazi tattoo | T...   Page 3 of 6

In Bishop's lawsuit, she says the agency abruptly decided she could no longer be a K-9 handler if she took a one-year assignment and promotion to work in the ATF Science and Technology division, after previously telling her she could do both.

Free
Shipping
On Or-
ders
$75+

Bishop has since retired her bomb dog, Allegra, and has been promoted as supervisor of the Seattle division's Crime Gun Intelligence Center.

The government says in court filings a decision was made that Bishop could not do both jobs at the same time.

Bishop says the agency's about-face came just weeks after she had filed an EEOC complaint in May 2016, alleging racial harassment by Devlin, after he purportedly told a federal prosecutor in Oregon that he questioned Bishop's experience as a street agent and said she would be a "train wreck" if assigned to the Eugene office. Bishop claims it was the latest in a series of conflicts between the two, including an incident in 2009 when Bishop says she confronted Devlin after he sent racially offensive emails using an ATF email account to several agents in the Gang Group, including Bishop.

## Sign up for Morning Brief

*Delivered bright and early weekday mornings, this email provides a quick overview of top stories and need-to-know news.*

"As the only woman of color in our group, these emails publically humiliated me," she wrote in a sworn declaration.

One email, included with the lawsuit filings, shows a black woman talking through a telephone handset to a black man behind a glass partition in prison, with a Santa Claus and reindeer superimposed. It states, "Merry Christmas from the Johnsons."

When Bishop confronted Devlin about these and other purportedly offensive emails, she claims he told her to "get the hell out of my office," and came around the desk with his fists balled. In other instances, she claims Devlin had disparaged her as being "bossy," "worthless," "contemptuous," and a "not-aggressive worker" — all comments the lawsuit alleges "stereotype black women."

In another instance, after Devlin yelled at her about the use of her agency vehicle, Bishop says "she found a banana placed on the hood of her car in her new parking spot next to Devlin's spot — a racist symbol of viewing Black people as monkeys," the lawsuit alleges.

Bishop learned of Devlin's Nazi-themed tattoo in 2009, when she was assigned to a group he supervised. The large tattoo on his left arm depicts an eagle bearing twin lightning bolts — a stylized "SS," which Bishop acknowledged in a deposition is a reference to the brutal Schutzstaffel, Hitler's notorious secret police responsible for murdering millions of Jewish citizens and ethnic minorities during World War II.

She said she complained to another supervisor at the time after a confrontation with Devlin, but nothing was done, although Devlin was transferred to Oregon not long afterward. Bishop says that she saw Devlin show off the tattoo in public, including at a retirement party for an agent in 2011, where she says he rolled up his sleeve and showed other colleagues "while eyeing (Bishop) with a grin." He has said he views the tattoo as a "war trophy" from his undercover work.

**EXHIBIT C**

**From:** Devlin, Bradford L. <Bradford.Devlin@atf.gov>
**Sent:** Thursday, November 21, 2019 12:03 PM
**Subject:** Lawsuit

As you are all aware, The Seattle Times published another article on Nov. 18th announcing Cheryl Bishop's victory lawsuit against the government claiming harassment, discrimination, and retaliation (attached). Unfortunately, I have not only been used as a means to her end - but as an ATF employee, I was prohibited from discussing anything related to her "pending litigation." I was reminded several times by ATF management and attorneys that in no circumstance could I say anything about the case while in litigation.

Now that the litigation is over, I have a couple things to say.

The EEO Commission did not give Cheryl a victory on any of her previous EEO complaints where I was accused of being racist, having a swastika tattoo, racial harassment, disparagement, and retaliation. If Cheryl didn't like the EEO Commission's final decision, she was allowed to appeal her case to the US District Court, which she did. Trial was scheduled to begin Oct. 28, 2019. I was looking forward to going to trial. In lieu of trial, the government agreed to a cash settlement of $450K.

About 15 years ago, I was in the Enhanced Undercover Program. I was asked by ATF SOD to work as one of three full time undercovers in an Aryan biker case in Ohio. Ultimately, we were patched-in to the Aryan Biker Club. The by-laws of the club were to get the club symbol tattooed once voted in as a member. When I became a full-patched member, I got the tattoo. ATF agent cashier funds paid for the tattoo. The tattoo is a German Eagle with "SS" bolts in the center of the eagle and it's located on my upper left arm hidden from public view. I'm not a tattoo guy. I do not like them and it's the only tattoo I have. I spent 8 months in an undercover role on that case. Every agent who worked that case, put their heart and soul into it. It wasn't easy, but in the end we had 40 federally indicted defendants.

When the case was over, I asked ATF SOD if they would pay to remove my tattoo. I was asked to obtain an estimate for laser removal. The estimate came in at 3-4K. The Chief of SOD at the time said ATF would not pay to have my tattoo removed.

During the same time that Cheryl filed her initial EEO Complaint, I had accepted a position in HQ and had acquired housing in the DC area. My plan was to do my HQ time, get a 15 job, return to Seattle and retire. As a result of the first EEO Complaint, I was investigated by Internal Affairs and expelled from HQ. During the Internal Affairs investigation, only one person was interviewed and the investigation was sent back to Division for "action." I received a Letter of Caution from my ASAC stating I should not discuss a subordinate's work ethic. Neither I, nor anyone in my group, were ever interviewed by IA. My ASAC at the time told me ATF would pay for the removal of my tattoo. I asked my ASAC how the payment for removal would work, if it would come out of AC funds, or if it was something I could pay for on my G-Card. For some

reason, I never followed up with my ASAC and soon after that conversation, that ASAC was promoted and transferred. I have never declined to have the tattoo removed.

I was mandated by subpoena to be deposed for the recent lawsuit. The subpoena included that I allow photos taken of my tattoo. The Seattle Times has published a total of 4 articles regarding Chery's lawsuit. Each article displayed the same photograph of me taken by Cheryl's attorney during my recorded deposition. I had no idea that photograph would be published not once but on 4 separate occasions and available on the internet for the world to see. This is a significant safety/security issue for me and my family. My name, face, tattoo, the name of the Aryan case I worked, and that I am an ATF Agent in Eugene, Oregon was put on the internet for every criminal to see.

Immediately after the first Seattle Times article was published, Division and HQ were notified. They were also notified after each subsequent article. I personally sent emails but never received one reply. I am livid that Cheryl and her attorney would publish a photo of me and disclose my identity as a current ATF employee. I think this is ethically wrong and unprofessional. To this day, I have never received any contact or support from HQ regarding the published articles, my concerns, my inquiries, or the case in general. I'm also certain that ATF HQ and/or PGA made no attempt to stop Cheryl, her attorney, or the Seattle Times from publishing further articles.

The Seattle Times articles claim that I made several statements such as: the tattoo was a war trophy from my undercover days; I declined ATF's offer to remove the tattoo; I would not remove the tattoo unless the other UC agents removed theirs and that I have always been a separatist racially. I never made any of those statements. I have attached my deposition. See for yourself. I have redacted the names of others involved in the lawsuit out of respect for their privacy.

The Seattle Times quoted a Federal Public Defender who said the very existence of my tattoo is evidence that I have a bias against certain minority groups which would trigger Brady requirements. I contacted the U.S. Attorney's Office and was told that none of my cases are in jeopardy and would not trigger the requirements of Brady.

I am unaware of any ATF or DOJ policy which allows an employee to go to the media during ongoing litigation – criminal or civil. If I would have gone to the media, I would have been fired. We need policy that prevents any employee from going to the media to promote any civil or criminal case and so this does not happen to someone else.

I never showed Cheryl my tattoo. Cheryl's initial complaint was that I had a Swastika tattoo and that she saw it. I do not have a Swastika tattoo. Cheryl also claims I sent racially insensitive emails. In 2009, I did send emails to the entire group that I thought were humorous. Cheryl never discussed with me anything about her being offended by my emails. Cheryl's initial complaint requested that ATF get into my computer and review all my emails suggesting that ATF would find evidence of racism. ATF did search my computer and cell phone and found no

evidence of racism, harassment or retaliation. I never intended to be insensitive or offensive. One of the emails I sent was a cartoon depicting Obamacare as an enema. I thought it was funny. Once Cheryl filed her complaint, an ATF attorney in HQ requested Internal Affairs investigate me for Hatch Act Violations based upon the Obamacare cartoon. And the story of the banana peel found on Cheryl's car...the first time I heard that story was when the first Seattle Times story broke. I didn't place a banana peel on Cheryl's car.

I am guilty of calling Cheryl a trainwreck. My use of that word was never based on Cheryl's race. It was based on her incompetence as an agent and lack of investigative experience.

I have heard several times and even read in The Seattle Times that ATF Management was "appalled" that I had a racist tattoo. I am sorry that you were appalled. I'm not sorry for doing my job. I have never intentionally tried to offend or humiliate Cheryl Bishop. I am not a racist, never have been and never will be.

Cheryl and her attorney played it well. Their strategy was effective and they won $450K of taxpayer dollars.

Hope the ring turns out well.

Thanks for reading,
Brad Devlin


Brad Devlin
Resident Agent in Charge
Eugene Field Office
Seattle Field Division
Office - (206) 204-9910
Fax - (206) 204-9923
Cell - (206) 251-8097

**EXHIBIT D**

**Beasley, Roger L.**

| | |
|---|---|
| **From:** | Fang, Timmy C.  (Contractor) |
| **Sent:** | Monday, March 9, 2020 12:29 PM |
| **To:** | Beasley, Roger L. |
| **Cc:** | Boone, Adrienne |
| **Subject:** | INC0727913 - RE: BCC list |

Hi Roger,

The timestamp was 12:03PST which translates to 3:03PM EST.  There were at least a 2nd copy of **Lawsuit** in the mailbox, but this is the list from one of them.  The other was empty.

Crump, Jason R. <Jason.Crump@atf.gov>; Foreman, Sarah L. <Sarah.Foreman@atf.gov>; King, Thomas J. <Thomas.King@atf.gov>; Russell, Rodney J. <Rodney.Russell@atf.gov>; Ybarra, Aaron R. <Aaron.Ybarra@atf.gov>; Cooper, Kenneth R. <Kenneth.Cooper@atf.gov>; Gage, Travis J. <Travis.Gage@atf.gov>; Gonzales, Janeece K. <Janeece.Gonzales@atf.gov>; Hipp, Kenneth R. <Kenneth.Hipp@atf.gov>; Kondo, Hoshihito P. <Hoshihito.Kondo@atf.gov>; Lambright, Ralph R. <Ralph.Lambright@atf.gov>; Middelhoven, Pieter R. <Pieter.Middelhoven@atf.gov>; Miller, Joel <Joel.Miller@atf.gov>; Moore, William H. <William.Moore@atf.gov>; Shackie, Ronald J. <Ronald.Shackle@atf.gov>; Zimmerman, Brooke A. <Brooke.Zimmerman@atf.gov>; Aguon, Mary F. <Mary.Aguon@atf.gov>; Dangan, Chris A. <Chris.Dangan@atf.gov>; Excell, Benjamin E. <Benjamin.Excell@atf.gov>; Gaines, Jeffrey (ATF) <Jeffrey.Gaines@atf.gov>; Mullins, Oliver D. <Oliver.Mullins@atf.gov>; Sherman, Joshua D. <Joshua.Sherman@atf.gov>; Arline, Napoleon <Napoleon.Arline@atf.gov>; Bost III, John W. <John.BostIII@atf.gov>; Graham, Gery J. <Gery.Graham@atf.gov>; Horenburg, Terence M. <Terence.Horenburg@atf.gov>; Joseph, Aaron R. <Aaron.Joseph@atf.gov>; Leong, Genevieve  M. <Genevieve.Leong@atf.gov>; Lewis, Christopher L. <Christopher.Lewis@atf.gov>; McLean, Anthony F. <Anthony.McLean@atf.gov>; Nguyen-Murley, Nicole <Nicole.Nguyen-Murley@atf.gov>; Tuitele, Christopher N. <Christopher.Tuitele@atf.gov>; Villagomez, Joseph L. <Joseph.Villagomez@atf.gov>; Wittrock, Susan P. <Susan.Wittrock@atf.gov>; Butler, James C. <James.Butler@atf.gov>; Helm, Wendy L. <Wendy.Helm@atf.gov>; Julius, Adam F. <Adam.Julius@atf.gov>; McNall, Michael C. <Michael.McNall@atf.gov>; Northcutt, Michael L. <Michael.Northcutt@atf.gov>; Piergaliini, Mario E. <Mario.Piergallini@atf.gov>; Quintanilla, John N. <John.Quintanilla@atf.gov>; Ramsey, William F. <William.F.Ramsey@atf.gov>; Reid, Danny  S. <Danny.Reid@atf.gov>; Smith, Christopher T. <Christopher.Smith@atf.gov>; Steen, David R. <David.Steen@atf.gov>; Tomaso, Jared P. <Jared.Tomaso@atf.gov>; Wihera, Timothy J. <Timothy.Wihera@atf.gov>; Alconaba, Katrina F. <Katrina.Alconaba@atf.gov>; Almgren, Robert K. <Robert.Almgren@atf.gov>; Bach, Bryan A. <Bryan.Bach@atf.gov>; Callia, Victoria B. <Victoria.Callia@atf.gov>; Eleveld, Jeffrey D. <Jeffrey.Eleveld@atf.gov>; Karr, Leann <Leann.Karr@atf.gov>; Keller, J. Mark <Mark.Keller@atf.gov>; Schaefer, Justin A. <Justin.Schaefer@atf.gov>; Vitti, Michael L. <Michael.Vitti@atf.gov>; Willis, Brandon L. <Brandon.Willis@atf.gov>; Brown, Jason W. <Jason.Brown@atf.gov>; Doane, Jodi R. <Jodi.Doane@atf.gov>; Enk, Caleb T. <Caleb.Enk@atf.gov>; Jacobs, Roland L. <Roland.Jacobs@atf.gov>; Johnson, Amanda R. <Amanda.Johnson@atf.gov>; Lawrie, Michelle L. <Michelle.Lawrie@atf.gov>; Miller, Nathan A. <Nathan.Miller@atf.gov>; Schodowski, Anthony N. <Anthony.Schodowski@atf.gov>; Ziesemer, Benjamin N. <Benjamin.Ziesemer@atf.gov>; Crawford, Vicki S. <Vicki.Crawford@atf.gov>; Duke, David M. <David.Duke@atf.gov>; Hagman, Kurt W. <Kurt.Hagman@atf.gov>; Lomax, Justin <Justin.Lomax@atf.gov>; Maier, Kathy A. <Kathy.Maier@atf.gov>; McLean, Anthony F. <Anthony.McLean@atf.gov>; Nielsen, Michelle L. <Michelle.Nielsen@atf.gov>; Rushing, Caleb <Caleb.Rushing@atf.gov>; Schlecht, Aaron J. <Aaron.Schlecht@atf.gov>; Tallmadge, Jeremy D <Jeremy.Tallmadge@atf.gov>; Clark, Joshua D. <Joshua.Clark@atf.gov>; Devlin, Bradford L. <Bradford.Devlin@atf.gov>; Slackman, Noah K. <Noah.Slackman@atf.gov>; Suyehira, Samuel W. <Samuel.Suyehira@atf.gov>; Weber, Jason R. <Jason.Weber@atf.gov>; Zobel, Carmen  R. <Carmen.Zobel@atf.gov>; Alverson, Terry F. (Contractor) <Terry.Alverson@atf.gov>; Bates, Rosalind G. (Contractor) <Rosalind.Bates@atf.gov>; Beckstrand, Michael D. <Michael.Beckstrand@atf.gov>; Blais, Jonathan E. <Jonathan.Blais@atf.gov>; Brown, Jason W. <Jason.Brown@atf.gov>; Chudy, Jason R. <Jason.Chudy@atf.gov>;

1

Gathercole, Lynda J. <Lynda.Gathercole@atf.gov>; Hummel, Guy K. Jr <Guy.HummelJr@atf.gov>; McLeod, Kenneth A. (Contractor) <Kenneth.McLeod@atf.gov>; Mickelson, Peter W. <Peter.Mickelson@atf.gov>; Noel, William J. (Contractor) <William.Noel@atf.gov>; Orona, Stephanie J. <Stephanie.Orona@atf.gov>; Palmer, Tehran <Tehran.Palmer@atf.gov>; Phillips, Brennan S. <Brennan.Phillips@atf.gov>; Pleasants, Darek G. <Darek.Pleasants@atf.gov>; Rios, Yvonne M. <Yvonne.Rios@atf.gov>; Syversen, Jayme C. <Jayme.Syversen@atf.gov>; Tibbetts, John <John.Tibbetts@atf.gov>; Wear, Matthew <matthew.wear@atf.gov>; Webb, Scena B. <Scena.Webb@atf.gov>; Yoh, Aaron W. <Aaron.Yoh@atf.gov>; Younger, Eric W. <Eric.Younger@atf.gov>; Eshom, Joseph A. <Joseph.Eshom@atf.gov>; Estep, Kathryn R. <Kathryn.Estep@atf.gov>; Grigore, Claudia L. <Claudia.Grigore@atf.gov>; Helgren, Isaac T. <Isaac.Helgren@atf.gov>; Hunt, J. Ben. <J.Hunt@atf.gov>; Jackson, Eric D. <Eric.Jackson@atf.gov>; Kowalchuk, Ryan <Ryan.Kowalchuk@atf.gov>; Langue, Tanna J. <Tanna.Langue@atf.gov>; Mayo, Michael D. <Michael.Mayo@atf.gov>; Petrulak, Nathan R. <Nathan.Petrulak@atf.gov>; Prose, Elliott J. <Elliott.Prose@atf.gov>; Salcepuedes, Angelo D. <Angelo.Salcepuedes@atf.gov>; Steffes, Eric L. <Eric.Steffes@atf.gov>; Wasmund, Andrew F. <Andrew.Wasmund@atf.gov>; Wozniak, Earl A. <Earl.Wozniak@atf.gov>; Agate, Clayton D. <Clayton.Agate@atf.gov>; Belshay, Robert A. <Robert.Belshay@atf.gov>; Cole, Catherine L. <Catherine.Cole@atf.gov>; Collier, Michael J. <Michael.Collier@atf.gov>; Conaty, John <John.Conaty@atf.gov>; Dodsworth, Dawn T. <Dawn.Dodsworth@atf.gov>; Heller, Gregory K. <Gregory.Heller@atf.gov>; Jones, Wade J. <Wade.Jones@atf.gov>; McCarty, Robin R <Robin.McCarty@atf.gov>; Merritt, Nathaniel A. <Nathaniel.Merritt@atf.gov>; Nelson, Keeli L. <Keeli.Nelson@atf.gov>; Perkins, William W. <William.Perkins@atf.gov>; Pinkerton, Jeremy C. <Jeremy.Pinkerton@atf.gov>; Price, Wesley B. <Wesley.Price@atf.gov>; Tomlinson, Gregory P. <Gregory.Tomlinson@atf.gov>; Wear, Matthew <matthew.wear@atf.gov>; Widmer, Lexie A. <Lexie.Widmer@atf.gov>; Arnold, Brian M. <Brian.Arnold@atf.gov>; Cline, David M. <David.Cline@atf.gov>; Hansen, Jonathan L. <Jonathan.Hansen@atf.gov>; Radosevich, Kit K. <Kit.Radosevich@atf.gov>; Vavilin, Andriy I. <Andriy.Vavilin@atf.gov>; Vorotnikova, Natalia O. <Natalia.Vorotnikova@atf.gov>; Hampton, Darren D. <Darren.Hampton@atf.gov>; Villegas, Monique Y. <Monique.Villegas@atf.gov>; Graham, Michael P. <Michael.Graham@atf.gov>; McCracken, Brice P. <Brice.McCracken@atf.gov>; Byrd, Richard D. <Richard.Byrd@atf.gov>; Howe, Craig A. <Craig.Howe@atf.gov>; Chittum, Thomas L. <Thomas.Chittum@atf.gov>; Nunez, Celinez <Celinez.Nunez@atf.gov>; Sitowski, Brent <brent.sitowski@state.or.us>; Swanson, Lance D <Lance.D.Swanson@ice.dhs.gov>; Floyd, Eric <Eric.Floyd@atf.gov>; Summers, Jessie R. <Jessie.Summers@atf.gov>; Hanemann, Janet L. <Janet.Hanemann@atf.gov>; Korn, David W. <David.Korn@atf.gov>; Maguire, Jenna L. <Jenna.Maguire@atf.gov>; Todd Jordan <TJordan@cityoflakewood.us>

Thanks!

Tim

Tim Fang | Leidos
Exchange Administrator | ESA IV Program
Phone: 202.400.1185
Timmy.C.Fang@USDOJ.GOV



**From:** Beasley, Roger L. <Roger.Beasley@atf.gov>
**Sent:** Monday, March 9, 2020 12:08 PM
**To:** Fang, Timmy C. (Contractor) <timmy.fang@atf.gov>
**Cc:** Boone, Adrienne <Adrienne.Boone@atf.gov>
**Subject:** BCC list

Tim – can you find this message and tell us who the email was sent to?

Thanks!

Originator: Bradford L. Devlin

2

449

**EXHIBIT E**

| | |
|---|---|
| **From:** | Pleasants, Darek G. |
| **To:** | Baudhuin, William S. |
| **Subject:** | Referral of Potential Misconduct |
| **Date:** | Monday, December 2, 2019 2:53:00 PM |
| **Attachments:** | DEVLIN Email and Attachments.pdf |
| **Importance:** | High |

SA Baudhuin,

1. On 21 November, Special Agent Bradford Devlin sent an email (attached) to an unknown/undisclosed number of persons.
   a. Upon reviewing the email I telephonically contacted Special Agent Devlin and immediately verbally counseled him regarding the email and considered the matter closed.

2. Subsequently, concerns have been raised to me that Special Agent Devlin's email may be construed as misconduct IAW ATF O 2130.3A Harassment in the Workplace.
   a. I request IAD review the associated email for potential misconduct as soon as possible.

3. After review, I am prepared to handle this matter ATF O 8610.1C, Paragraph 27, Management Referrals.

V/R,
DP

Darek G. Pleasants
Special Agent in Charge
ATF – Seattle Field Division
1521 1st Avenue South, Suite 600
Seattle, WA 98134
darek.pleasants@atf.gov
Office: 206-204-3205
Mobile: 314-591-7617

**EXHIBIT F**



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Seattle Field Division*

*1521 1ˢᵗ Ave. S., Suite 600
Seattle, Washington 98134*
www.atf.gov

JAN 1 3 2020

787000:DGP
8610.C

MEMORANDUM TO:     Special Agent in Charge
                   Internal Affairs Division

           FROM:   Special Agent in Charge
                   Seattle Field Division

        SUBJECT:   Management Referral for Action

The purpose of this memo is to provide response to Internal Affairs Division Incident Report
#20208049 DEVLIN, Bradford L., received by the Seattle Field Division on 6 January 2020.

Upon receipt of the referral, Special Agent in Charge (SAC) Seattle Field Division reviewed the
facts associated with the incident report. On 21 November 2019, Special Agent Bradford Devlin
sent an email (attached) to an unknown/undisclosed number of persons. Upon reviewing the
email, in my role as SAC Seattle Field Division, I immediately contacted Special Agent Devlin
by telephone and verbally counseled him regarding the email.

Subsequently, concerns were raised to me by ATF's Office of Chief Counsel that Special Agent
Devlin's email may be construed as misconduct IAW ATF O 2130.3A, Harassment in the
Workplace. Given ATF O 2130.3A requires that all potential allegations of harassment be
referred to IAD, I contacted Internal Affairs on 2 December 2019 and requested a review for
potential misconduct be conducted.

On 6 January 2020, Incident Report #20208049 was returned for action IAW ATF O 8610.1C,
Paragraph 27, Management Referrals.

Based upon the totality of the circumstances, SAC Seattle has determined that counseling
conducted with SA Devlin on 21 November 2019 was the appropriate corrective action and
further discipline was not warranted.

-2-

Special Agent in Charge
Internal Affairs

Seattle Field Division anticipates no further action on this matter.

Special Agent Bradford L. Devlin retired from ATF officially on 31 December 2019.

Darek G. Pleasants

Enclosures

cc: DAD-West

290